**James C. WRIGHT et al.,
Plaintiffs-Appellees,**

v.

**Ruth RUSHEN et al.,
Defendants-Appellants.**

**No. 80–4534.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1981.

Decided March 13, 1981.

John T. Murphy, San Francisco, Cal., for defendants-appellants.

Sanford Jay Rosen, Rosen & Remcho, San Francisco, Cal., for plaintiffs-appellees; Gary P. Reynolds, Sacramento, Cal., on brief.

Before SNEED and KENNEDY, Circuit Judges, and HEMPHILL *, District Judge.

SNEED, Circuit Judge:

The issue is whether the district court properly issued a preliminary injunction mandating extensive changes at three California state prisons. Because we conclude that the district court did not apply the proper legal standards assessing the plaintiffs' probability of ultimate success on the merits, the entire preliminary injunction

---

* Honorable Robert W. Hemphill, Senior United States District Judge for the District of South Carolina, sitting by designation.

must be set aside. We remand the case to the district court for further proceedings consistent with our opinion.

## BACKGROUND

The plaintiffs are a class of approximately 2,000 prisoners confined in administrative segregation in four California state prisons, Deuel Vocational Institution, Folsom Prison, San Quentin Prison, and Soledad Correctional Training Facility. Segregated housing within the California prisons is of various types, depending in part upon whether the inmate is ·considered a threat to others or a likely target for violence by his fellow inmates. The defendants are the wardens of the prisons and the California Director of Corrections. The plaintiffs sought relief on two claims. In *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976), aff'd, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), a three-judge panel convened pursuant to 28 U.S.C. § 2281, now repealed, granted relief on the first claim. The court concluded that the due process clause of the Fourteenth Amendment mandated various procedural requirements concerning placement in administrative segregation.

This case involves the second claim for relief, based on the Eighth Amendment's prohibition of cruel and unusual punishment. The plaintiffs obtained a preliminary injunction on November 3, 1980, mandating changes in the conditions of confinement at three of the prisons, Deuel, San Quentin, and Soledad. The plaintiffs did not seek preliminary injunctive relief at Folsom. The district court based its decision on declarations of inmates, psychiatrists, and prison staff, depositions of the defendants, and photographs of the prisons. In its opinion, it reviewed the physical conditions, sanitary conditions, food services, educational practices, medical services, placement and retention procedures, and the psychological impact of confinement in the administrative segregation units of the prisons. The court did not conclude that any one condition amounted to cruel and unusual punishment. Instead, relying primarily on *Laaman v. Helgemoe*, 437 F.Supp. 269 (D.N.H.1977), the court concluded that the totality of conditions under which the plaintiffs are confined warranted the issuance of a preliminary injunction.

The preliminary injunction is appended to this opinion. It orders six types of relief. Examples of the mandates of each part of the preliminary injunction follow. Part I addresses the physical conditions of confinement. It prohibits involuntary double-celling of inmates, an issue under review by the Supreme Court in *Rhodes v. Chapman*, 49 U.S.L.W. 3322 (Nov. 4, 1980), and orders the provision of numerous supplies, such as a writing surface and a· shelf in each cell. Part II addresses sanitary conditions and food services. It mandates daily cleaning of showers and requires what the parties appear to agree would amount to three hot meals each day for inmates in administrative segregation rather than two hot meals and a bagged lunch. Part III primarily addresses recreational and educational programs, and requires prison officials to provide college level education courses and facilities where inmates may sit down and play table games in the exercise yards. Part IV requires that an inmate in administrative segregation be permitted to have overnight visits with his spouse unless the inmate is given a detailed written statement explaining why he is denied this privilege and afforded a hearing to contest the denial. Part V requires that medical services be the same in an administrative segregation unit as in the rest of the prison. Part VI sets standards for retention in administrative segregation, requiring a hearing at which the prison officials must demonstrate that release from administrative segregation would endanger security.

A panel of this court stayed portions of the preliminary injunction on November 30, 1980, and ordered expedited consideration of this appeal. The plaintiffs request that we dissolve the partial stay, while the defendants urge us to vacate the preliminary injunction. On February 13, 1981, following briefing and oral argument, we continued the partial stay and ordered additional

portions of the preliminary injunction stayed. We now vacate the entire preliminary injunction.

## ANALYSIS OF EIGHTH AMENDMENT CHALLENGES TO PRISON CONDITIONS

### A. *The Fundamental Error of the District Court*

■ A court issuing a preliminary injunction must consider the probable outcome of the case and the balance of hardships to the parties. To obtain a preliminary injunction a party must show either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1201 (9th Cir. 1980); *Benda v. Grand Lodge of the International Association of Machinists & Aerospace Workers,* 584 F.2d 308, 314–15 (9th Cir. 1978); *Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir. 1975). The district court concluded that a preliminary injunction was warranted under the second phrasing of the test. It concluded that the plaintiffs raised serious questions as to the constitutionality of their confinement and that the balance of hardships tips sharply in favor of the inmates. Our standard of review is whether the district court abused its discretion. *Los Angeles Memorial Coliseum Commission, supra,* 634 F.2d at 1200. But a preliminary injunction will be set aside if the district court erred in the legal standards it applied in its review of the probability of success on the merits. *Id.* A court lacks discretion to apply the law improperly. *Benda, supra,* 584 F.2d at 314.

■ We hold that the district court erred in its use of the "totality of conditions" approach. This error led it to fashion a remedy embracing a broad range of prison reforms rather than tailoring its remedy to ensure that the requirements of the Eighth Amendment are satisfied. It used its perception of the "totality of conditions" as a key by which the door barring access to the operation of state prison by federal courts is opened widely to the plenary supervisorial power of these courts. Properly used that perception should permit access only to correct those conditions necessary to eliminate the type of treatment condemned by the Eighth Amendment. The Supreme Court's admonition in *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979), advising courts to avoid enmeshing themselves in the minutiae of prison operations in the name of the Constitution, is relevant.[1] The Court cited with approval the Second Circuit's statement that "[a]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care,

---

1. The Court stated:

There was a time not too long ago when the federal judiciary took a completely "hands-off" approach to the problem of prison administration. In recent years, however, these courts largely have discarded this "hands-off" attitude and have waded into this complex arena. The deplorable conditions and draconian restrictions of some of our Nation's prisons are too well known to require recounting here, and the federal courts rightly have condemned these sordid aspects of our prison systems. But many of these same courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution, or in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside the Judicial Branch of Government.

441 U.S. at 562, 99 S.Ct. at 1886.

and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), cited in 441 U.S. at 529 n.11, 99 S.Ct. at 1869 n.11.

The teaching of *Wolfish*, which involved a federal facility, is even more appropriate here. The district court's preliminary injunction and opinion reflects little awareness of the admonition of *Wolfish*. The Supreme Court again recently displayed increasing sensitivity to federal court intrusion into state government affairs. *Sumner v. Mata*, —— U.S. ——, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). This court has cautioned: "The federal courts should use great restraint before issuing orders based on the finding that the state has followed unlawful procedures in discharging the unenviable task of keeping dangerous men in safe custody under humane conditions." *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir.1979); *see Manney v. Cabell* (9th Cir., No. 79–3260, April 29, 1980) (petition for rehearing pending). Rather than restraining its remedy to correcting Eighth Amendment violations, the district court in this case ventured far into the realm of prison reform. Prison reform, beyond the standards required by the Eighth Amendment, is the function of state government officials. *See* Robbins and Buser, *Punitive Conditions of Prison Confinement: An Analysis of Pugh v. Locke and Federal Court Supervision of State Penal Administration Under the Eighth Amendment*, 29 Stan.L.Rev. 893, 917 (1977); Note, Federal Courts and State Prison Reform: A Formula for Large Scale Federal Intervention Into State Affairs, 14 Suffolk U.L.Rev. 545, 576 (1980). Therefore, the preliminary injunction must be vacated.

### B. *Proper Analysis of Eighth Amendment Challenges To Conditions In State Prisons*

■ In analyzing a challenge to prison conditions based on the Eighth Amendment, a court' should examine each challenged condition of confinement, such as the adequacy of the quarters, food, medical care, etc., and determine whether that condition is compatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958); quoted in *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), and *Spain, supra*, 600 F.2d at 196.[2] Any condition of confinement which passes this test is immune from federal intervention. If no challenged condition fails to meet the test, the entire facility and its administration are immune from Eighth Amendment attack. Of course, each condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions. *Compare Spain, supra*, 600 F.2d at 199 (outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day) *with Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980) (outdoor exercise not required when prisoners otherwise had access to day room 18 hours per day.). But the court's principal focus must be on specific conditions of confinement. It may not use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required to correct Eighth Amendment violations.

---

2. We note that the plaintiffs believe that standards of decency have evolved considerably. It appears that the framers of the Constitution intended that the Eighth Amendment would proscribe torturous punishments such as public dissection. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Calif.L.Rev. 839, 865 (1969). At the beginning of this century the constitutionality of whipping was questionable. Note, *What is Cruel and Unusual Punishment*, 24 Harv.L.Rev. 54, 56 (1910). The recent case which ended the prior federal court practice of keeping "hands-off" state prisons, *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971), involved a prison system with very few paid employees, in which prisoners guarded and abused other prisoners, and in which there were reports of whippings. 309 F.Supp. at 367. In the present case the plaintiffs argue that the denial of overnight visits with spouses constitutes cruel and unusual punishment. *See generally* Sneed, *When Should Lions Be on the Throne? Reflections on Judicial Supremacy*, 21 Ariz.L.Rev. 925, 937–38 (1979).

We recognize that a court may properly allow some margin of error when correcting violations and that it has broad power to see that its remedies are not frustrated by contumacious officials. But we reject the notion that a finding of a violation with respect to a specific condition of confinement entitles a court to fashion a remedy requiring prison officials to operate all aspects of their prisons in accordance with a design of prison reform accepted by the court as right and proper.[3]

Our decision is entirely consistent with *Spain, supra.* In that case we considered the cumulative effect of related prison conditions, such as confinement in small cells nearly 24 hours every day, in approving an order mandating outdoor exercise. 600 F.2d at 199. We also held that the use of large doses of tear gas to remove obstinate prisoners from their cells, and the use of handcuffs, neck chains, waist chains, and leg manacles whenever an inmate left his cell, amounted to cruel and unusual punishment. *Id.* at 196. But we did not go on to order changes in diet, medical services, and other challenged conditions of confinement which by themselves did not constitute cruel and unusual punishment.

■ In addition, we note that the district court gave no weight to the defendants' protests that many of its orders would compromise prison security. Although the need for security does not justify cruel and unusual punishment, and while a court must not unquestioningly defer to prison officials' analyses of security issues, recent events make it all too clear that the security of prisons and their inmates is a genuine issue to which we must give attention. Before ordering remedial measures in a case challenging conditions of confinement under the Eighth Amendment, a district court should determine whether the remedy will impair prison security. If such impairment is likely, the court must give explicit consideration to the practicality of the remedy in light of legitimate security concerns.

■ A similar examination with respect to the costs to the state of its remedies should be made. Again, costs cannot be permitted to stand in the way of eliminating conditions below Eighth Amendment standards. However, a focus on costs will tend to stay the hand of a district court when its otherwise generally praiseworthy compassion might tempt it to adopt an unnecessarily expensive and comprehensive remedy. These security and cost impact analyses need not reflect the precision we expect from experts upon whose opinions state officials must rely in undertaking prison reform, but it must be made evident to a reviewing court that the district court did in fact focus on the impact of its remedies, even when cast only in the form of a preliminary injunction, on prison security and the resources of the state.

■ Finally, we note that nearly all of the district court's mandates are probably desirable components of a prison system.[4] Chief Justice Burger has recently urged improvements in prison conditions as part

---

**3.** Some district courts have issued injunctions similar to the one challenged in this case based on a finding that the totality of conditions violated the Eighth Amendment. *See, e. g., Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977), *remanded*, 599 F.2d 17 (1st Cir. 1979); Fair, The Lower Federal Courts as Constitution-Makers: The Case of Prison Conditions, 7 Am. J.Crim.L. 119, 137–39 (1979). The Fifth Circuit has approved this approach. *Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1977). While the language used by the Fifth Circuit does not square with ours, we note that the conditions of confinement challenged in those cases were generally considerably more shocking than those challenged in this case. For example, the plaintiffs in *Williams* complained because the most dangerous prisoners, such as

the plaintiffs in this case, were not segregated from the general prison population, leading to stabbings and forcible rapes. *Id.* Such conditions could be found unconstitutional in themselves.

**4.** Most of the mandated changes are similar to the standards recently promulgated by the Justice Department in its *Federal Standards ·for Prisons and Jails* (1980). As former Attorney General Civiletti stressed in the preamble, however, "these standards should not be taken to be a statement of constitutional minima." *Id.* at 1. *See also* American Bar Association Standards for Criminal Justice, *Legal Status of Prisoners* (1981).

of an overall attack on crime. *New York Times*, Jan. 9, 1981, p. 11, col. 3. Courts must diligently ensure compliance with constitutional requirements and with statutes designed to improve prison conditions. But courts may not institute reform programs on their own under the guise of correcting cruel and unusual punishment.[5]

The preliminary injunction is vacated and the case is remanded to the district court for further proceedings consistent with this opinion.

## APPENDIX

### PRELIMINARY INJUNCTION

It is ORDERED, ADJUDGED AND DE-CREED as follows:

Defendants, the Director of the California Department of Corrections, the Wardens and Superintendents of the California State Prison at San Quentin, Deuel Vocational Institution at Tracy, and Correctional Training Facility at Soledad, their agents, servants, employees, successors in office and all persons in active concert or participation with them, are hereby restrained and enjoined from continuing to confine, or causing to be confined, in administrative segregation, any member of the plaintiff class unless they implement fully and within the times prescribed each of the requirements set forth in this Preliminary Injunction.

### I.

Defendants shall take immediate steps to provide the following physical and environmental facilities and/or conditions to all members of the plaintiff class.

1. Each cell used for administrative segregation shall be supplied with a bed and a clean, untorn mattress, two clean blankets, a properly functioning toilet, a properly functioning sink with running water, a surface which the occupant can use for writing while in an uncramped seated position, shelf space, and adequate lighting.

2. No prisoner shall be involuntarily double-celled with another prisoner.

3. Defective or clearly inadequate heating, cooling, ventilating, and plumbing equipment shall be repaired or replaced promptly unless the defect or need for repair results from any deliberate act of the prisoner or prisoners suffering from the defect or inadequacy.

4. Unless caused by a prisoner or prisoners suffering as a consequence of broken windows, they shall be repaired promptly. Temporary covering shall be placed over all broken windows pending repairs.

### II.

Defendants shall take immediate steps to provide the following sanitary conditions to all members of the plaintiff class.

1. Each prisoner shall be provided with a clean cell, free of rodents, insects, and other vermin. Each cell shall be cleaned and disinfected by staff prior to each new occupancy. Defective cell furnishings (mattress, window, sink, toilet, etc.) shall be repaired or replaced prior to each new occupancy. All furnishings shall be kept in good working order throughout the prisoner's occupancy unless such working order has been precluded by any deliberate act or acts of the prisoner. To mitigate excessive noise, earplugs shall be provided to prisoners upon request for use during normal sleeping hours.

2. Each prisoner shall be provided with appropriate materials in sufficient quantities to clean his own cell. Prison staff shall provide regular service to rid each cell of rodents, insects, and other vermin unless the presence thereof is clearly due to the occupant's failure to keep the cell clean.

---

5. It is not clear from the district court's opinion whether the relief ordered in Part VI of the preliminary injunction is based on the Eighth Amendment or the Fourteenth Amendment. If that relief is based on the Eighth Amendment, the district court on remand should analyze the issue in accordance with this opinion. If it is based on the Fourteenth Amendment, the court should explain more fully why it is not required to reconvene the three-judge panel to consider that claim, as required by the saving clause in the Act repealing 28 U.S.C. § 2281, Pub.L. 94–381, § 7, 90 Stat. 1120 (1976).

3. All shower areas shall be cleaned and disinfected once a day.

4. Clothing, underwear, bedding, linen and other laundry items shall be issued and exchanged no less often than is provided for general population inmates.

5. Each prisoner shall be permitted to shower indoors at least three (3) times a week.

6. The types and quantities of food served shall be the same as that which is provided for general population inmates. All food shall be prepared, stored, and served under sanitary conditions. Food equipment shall be maintained in proper working condition. All persons who assist in the preparation and handling of food shall observe strict sanitary standards, including wearing caps and gloves. Meals shall be served to prisoners as promptly as reasonably feasible after preparation. Prisoners shall be provided with one or more reasonably adequate utensils for eating meals. Appropriate diets shall be provided to meet the bona fide medical or religious needs of prisoners to the same extent as provided to the general prison population.

### III.

Defendants shall take immediate steps to provide the following to all members of the plaintiff class.

1. Facilities where inmates may sit down and play table games shall be provided in the exercise yard of each unit.

2. Each exercise yard of each unit shall be provided with athletic facilities and equipment such as handballs, basketballs, chin-up bars, and a punching bag.

3. Prisoners shall be provided with outdoor exercise at least one (1) hour every day or two (2) hours every other day. If weather precludes outdoor exercise, prisoners shall be provided with the same amount of exercise inside to the fullest extent reasonably possible.

4. Prisoners shall be given reasonable opportunity to study law books, including, at a minimum, California Appellate and United States Supreme Court decisions from 1965 on, relevant annotated California and Federal codes, legal reference books, and case digests.

5. Individual or group instruction for high school and college level education courses shall be offered.

6. Access to educational television programs available on standard equipment shall be provided.

7. Vocational, hobby and craft training and materials shall be provided.

8. Chaplain services shall be offered to the same extent as offered to the general prison population.

### IV.

Defendants shall take immediate steps to provide the following visitation opportunities to all members of the plaintiff class.

1. Contact and family visits shall be provided as often and on the same basis as allowed for the general prison population, unless as to each prisoner denied such visits, the prisoner is provided with a written, detailed statement of the reason or reasons for denial and an opportunity for a fair hearing to contest the denial. Denial may be based only upon specific misconduct of the prisoner denied or upon reasonable proof that the danger of violence or escape is greater as to the prisoner denied than as to those members of the general prison population allowed contact and family visits, rather than upon such claims as difficulty in making arrangements or lack of facilities.

2. Defendants shall provide for the installation of at least one telephone in each unit. Telephone calls shall be provided as often and on the same basis as allowed for the general prison population, unless as to each prisoner denied such calls, the prisoner is provided with a written, detailed statement of the reason or reasons for denial and an opportunity for a fair hearing to contest the denial. Denial may be based only upon specific misconduct of the prisoner denied rather than upon such claims as difficulty in making arrangements or lack of facilities.

3. Sending and receiving of personal mail shall be permitted as provided in section 3343(d) and (i) of Title 15, California Administrative Code.

## V.

Defendants shall take immediate steps to provide the following medical services to all members of the plaintiff class.

1. Prison staff shall provide every reasonable medical, surgical, psychiatric, and dental service for prisoners, and shall maintain adequate facilities and staff for such service.

2. Emergency medical care shall be available at all times. Emergency dental and psychiatric care shall be provided on the same basis as for the general prison population.

3. When specialized medical, dental, and psychiatric services are deemed necessary and are not available within prison facilities, they shall be provided on the same basis as for the general prison population.

## VI.

For the reasons expressed in Section J of the Findings of Facts and Conclusions of Law, the relief granted in *Wright v. Enomoto*, (N.D.Cal.1976) 462 F.Supp. 397, 404–05 failed adequately to correct defendants' arbitrary practices in imposing administrative segregation. Defendants shall therefore take immediate steps to provide the following further procedural safeguards to all members of the plaintiff class.

1. Within forty-eight (48) hours of initial placement in administrative segregation, the inmate so placed shall receive written notice of reasons for his placement.

2. The decision to retain an inmate in administrative segregation shall be made at a hearing to be held not less than three (3) days nor more than ten (10) days after the inmate is initially confined in an administrative segregation unit.

3. The inmate shall receive a written decision from the finder of fact and, if the decision is adverse to the inmate, the decision must set forth the reasons for placement and/or retention and the information and evidence on which it is based. A decision to place and/or retain the inmate in administrative segregation must be based upon a conviction by those conducting the hearing that a preponderance of the evidence considered at the hearing substantiates the decision. No decision may be based upon information from an undisclosed source unless other written information corroborates that received from the source, or unless the circumstances surrounding the event in question and the known reliability of the source satisfy the finder of fact that the information is true. The fact of a confidential source will be documented in the information given to the inmate and as much of the information received as can be disclosed without identifying the source will also be given the inmate. Any document relating information from a confidential source will also include an evaluation of the reliability of the source, a brief statement of the reasons for the conclusions reached, and a statement of the reasons why the information or source is not disclosed.

4. An inmate shall be released from administrative segregation in a security housing unit [6] unless, before the expiration of twelve (12) months of consecutive confinement, he is afforded all the hearing rights that attend an inmate's initial placement in administrative segregation, and unless the CDC at this hearing shows, on the basis of the inmate's behavior, that his release would severely endanger the lives of inmates or staff or the security of the institution. Such behavior shall be factually documented or based on reliable information as set forth in this section. "Factual documentation" of misbehavior may be shown by the inmate's behavior, within the prior

---

**6.** As used in this Preliminary Injunction, "security housing unit" or "security housing" includes K-Wing at Deuel Vocational Institution, O-Wing at Soledad, Security Housing Units I, II, III (Adjustment Center, North Segregation Unit, excluding Death Row, and C-Unit) at San Quentin, so long as they remain so designated, and any other unit now or hereafter designated by the CDC as a security housing unit.

five (5) years, which has resulted in criminal convictions for escape, attempted escape, homicide or any assaultive crime, within a prison system; or by disciplinary offenses within the past twelve (12) months which involved the use or possession of a deadly weapon, physical assault, escape, attempted escape or possession of escape paraphernalia. "Reliable information", as that term is defined in section 3321 of Title 15, California Administrative Code, may be based on any events that have occurred since the last due process hearing resulting in placement or retention in security housing that the inmate is involved in or planning activity which would threaten his own safety or the safety of others. Reliable information, as that term is defined in section 3321, also includes information that an inmate in a security housing unit will be killed or forcibly assaulted or will attempt a forcible escape, or the inmate himself will kill, commit a forcible assault, or will be the principal in a forcible escape attempt.

6. [sic] An inmate shall not be involuntarily retained in any other administrative segregation unit unless, before the expiration of twelve (12) months of consecutive confinement, he is afforded all the hearing rights that attend an inmate's initial placement in administrative segregation and unless the CDC at this hearing shows that release of the inmate from segregation would endanger the inmate's own safety and/or the safety of others; or that release would jeopardize the integrity of an investigation into suspected criminal activity and/or serious misconduct; and/or that the hearing shows that the inmate is a serious risk. If the decision is based, in whole or in part, on gang membership, membership must be proven by evidence more probative than mere gang association or sympathy for any gang. For purposes of this section, proof of membership requires reasonably convincing proof of present and active allegiance to an unauthorized gang.

## VII.

Defendants shall provide a copy of this Preliminary Injunction to each member of the plaintiff class within ten (10) days hereafter and shall post a copy in each administrative segregation unit where it may be readily seen by class members.

## VIII.

No person who has notice of this Preliminary Injunction shall fail to comply with the letter and spirit hereof nor shall any such person subvert the letter and spirit hereof by any sham, indirection or other artifice.

## IX.

The Court retains jurisdiction to modify this injunction at any time and from time to time on its own motion or upon the motion of any party in the interest of effectuating its intendments and/or in the interest of furthering the ends of justice under all applicable law.

Dated: November 3, 1980.

## MODIFICATION OF PRELIMINARY INJUNCTION

Due to an inadvertence, the following provision, to which no party had made any objection, was omitted from the Preliminary Injunction herein issued under date of November 3, 1980. To correct that inadvertence, the following is hereby added to the Preliminary Injunction, *nunc pro tunc*, with the same effect as if originally included therein.

## X.

It is not the intent of this Preliminary Injunction to prohibit nor does it prohibit the Director or any Warden or Superintendent from temporarily suspending compliance with all or any part of this injunction during a state of turmoil or acute emergency, as defined by section 3383 of Title 15, California Administrative Code, or during an actual condition of turmoil or emergency of less widespread scope.

The foregoing and all other provisions of the Preliminary Injunction as issued on November 3, 1980, are hereby affirmed and confirmed *nunc pro tunc* as of that date.

Dated: November 7, 1980.