**Harris COHEN, Plaintiff,**

v.

**MARTIN'S, a New York Corporation, Defendant.**

**No. 78 Civ. 2385(DNE).**

United States District Court, S. D. New York.

April 16, 1982.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City (Neil A. Pollio, New York City, of counsel), for plaintiff.

Bondy & Schloss, New York City (David E. Nierenberg, New York City, of counsel), for defendant.

OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDELSTEIN, District Judge:

This is an action for unlawful termination of retirement benefits in violation of the

Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). The court has jurisdiction pursuant to 29 U.S.C. § 1132(f).

Plaintiff Harris Cohen ("Cohen") was employed by defendant Martin's, a retail department store, from February 1930 until his retirement on March 31, 1973. Plaintiff then began to receive pension benefits pursuant to a Martin's pension plan. On October 14, 1977, Seedman Merchandising Group, Inc. purchased Martin's, and in January, 1978, Martin's terminated Cohen's retirement benefits and ceased thereafter to make payments to him. Cohen then instituted this action to recover payments to which he claims he is entitled, and to require Martin's to continue making payments to him until his death.

## FACTUAL BACKGROUND

Martin's is a New York corporation which operates a chain of retail department stores throughout the New York metropolitan area. Until the Seedman acquisition in 1977, the Zeitz family owned and operated Martin's. Fred Zeitz ("Zeitz") was the Chief Executive Officer and responsible for the day-to-day operations of the company from 1930 until his death on May 25, 1977. Zeitz and his family were the directors and controlling shareholders of the corporation.

Cohen was first employed by Martin's in February, 1930 as an office manager and general ledger bookkeeper. He held these positions until 1934 when he became Controller. In 1942, Cohen was promoted to Treasurer. He continued as Controller and Treasurer until 1967 when he was elected Treasurer and Vice President, and designated the financial assistant to the Chief Executive of Martin's. He served in these capacities until he retired on March 31, 1973.

During his forty-three years at Martin's, Cohen was a trusted adviser and close friend of the Zeitz family. Zeitz regularly sought guidance from Cohen on personal as well as business and financial matters. The relationship between Cohen and Zeitz was one of complete mutual trust and confidence, and it was conceded by defendant that Zeitz held Cohen "in high esteem." As Cohen advanced at Martin's, he was granted greater responsibility in the operations of the company. After his appointment to Treasurer he administered virtually all of the financial operations, including the pension plan which is the subject of this litigation.

Martin's established two pension plans for its employees. In the 1950's, the Board of Directors of Martin's adopted a pension plan for the employees listed on the Martin's Rank and File Payroll. The Rank and File plan was unfunded and subject to termination. This plan did not cover any management or executive-level employees.

On August 29, 1966, the Board of Directors established a second pension plan, entitled "Martin's Executive Pension Plan" (the "Plan"), "for the benefit of the supervisory and executive employees" covering all "full-time executive payroll employees." Executive Payroll Employees, including Cohen, were paid on a bimonthly basis, and at all dates relevant to this proceeding were paid by check. Executive Payroll Employees were generally low-level management personnel.[1] The Plan, like the pension plan

---

1. When the Plan was adopted, there were sixty-eight persons on the Executive Payroll. Included in the Executive Payroll were the office clerk, the bookkeeper, the accounts payable clerk, the assistant buyer and other employees generally not considered executive personnel. Store managers, store buyers, merchandise managers and a limited number of higher-level executives were carried on the Executive Payroll as well. However, the majority of the employees included in the Executive Payroll were not high-level management personnel.

Martin's also maintained a Private Payroll for officers, directors, upper-level management, and, in addition, family members who were not rendering services to the company but who were nevertheless compensated by Martin's. Persons listed on the Private Payroll were paid bimonthly, and in cash to preserve the secrecy of their compensation. On or before August, 1966, Cohen was transferred from the Executive Payroll to the Private Payroll.

Cohen testified that the Private Payroll was "part and parcel of the entire Executive Payroll", and that the purpose of this separate

for rank and file employees, was unfunded.[2] In addition, the Plan expressly limited the vesting of any pension rights:

> [T]he Company assumes no contractual obligation as to the Plan's continuance or as to payment of said retirement benefits.... [T]he Company reserves the right, through action of the Board of Directors, to amend, modify or terminate the Plan in whole or in part at any time, or from time to time, in any respect.... No employee shall obtain vested rights to any retirement benefits hereunder prior to or after retirement.

A copy of the Plan was distributed to every employee whose name appeared on the Executive Payroll, together with a cover letter indicating that the Plan would become effective on September 19, 1966. The Plan provided that upon retirement each employee with twenty years continuous service was entitled to a pension of one and one-third percent of their annual salary for the previous five years, times the number of years of service, to a maximum of thirty years. The maximum pension was limited to $8,000 per year, less primary social security benefits. Thus, when Cohen retired, the maximum benefits he could receive under the Plan was $8,000 per year.[3]

In early 1969, Cohen became aware that Zeitz was contemplating the sale of the Martin's stores. Apprehensive about his job security and pension benefits in the event the business was sold, Cohen dis-

cussed these concerns with Zeitz. Additionally, Cohen expressed dissatisfaction with his salary and with his benefits under the Plan, and indicated that they were inadequate in light of his service to the company. Cohen also indicated that he was seriously considering a position with another company.

Zeitz urged Cohen to remain at Martin's to assist Wilbur Levin ("Levin"), Zeitz's nephew and the newly-elected President of Martin's, in managing the business. Cohen testified that in response to his concerns, Zeitz promised to ensure his employment and pension rights, and to provide him with supplemental pension benefits. Cohen further testified that Zeitz specifically assured him that his pension rights would not be subject to termination by Martin's or by a successor company. Subsequently, the following letter agreement, dated April 28, 1969 and signed by Levin as President of Martin's, was sent to Cohen.

> In recognition of your 39 years of continuous service, it is agreed that if your employment is terminated by Martin's (or any successor company) prior to your 65th birthday, retirement benefits computed as indicated below, shall immediately be payable to you, in monthly installments.
>
> Payments shall be at the rate of 40% of the average of your annual earnings for the 5 years immediately preceding the year of termination of your employment. From the amount so computed, will be

---

payroll was to preserve the confidentiality of the salaries and bonuses of the upper echelon employees and members of the Zeitz family. Throughout this litigation, Martin's has argued that the Private Payroll represented a third and separate payroll, distinct from the Executive Payroll. It was conceded at trial, however, by Robert Rosenthal ("Rosenthal"), the former president of Martin's, that when it was adopted the Plan included Private as well as Executive Payroll employees.

Martin's' contention that the Plan did not cover Private Payroll employees is not supported by the record. Private Payroll employees, including Cohen, received pension benefits under the Plan, and several witnesses testified at trial that the Private Payroll merely represented a portion of the Executive Payroll. Fur-

ther, the terms of the Plan did not specifically limit its coverage to members of the Executive Payroll.

2. The Plan stated that "The Company is making no provision for the funding or insuring of this Plan or any benefits hereunder, but it may at its option make such arrangements in the future. Nothing herein shall be construed to provide for the funding of any benefits herein provided."

3. Cohen was involved in the administration of the Plan and was fully familiar with its provisions. He was aware that after deducting his $3,108 annual primary social security benefits, his pension benefits would be $4,892 per year.

deducted the amount of your primary social security benefits.[4]

The April 28 letter agreement did not expressly state that Cohen's pension rights would not be subject to termination. Cohen testified that when he informed Zeitz of the omission in the agreement of any reference to non-termination, Zeitz replied "I have given you my assurance you have nothing to be concerned about; you will be taken care of after you reach the age of 65. You don't need anything else." Cohen was satisfied by these further assurances from his trusted friend, and remained in Martin's' employ without any documentation of the assurances and without the salary increase he had sought.

On December 15, 1972 Cohen reached his pension retirement age of sixty-five. Although Cohen had previously informed Zeitz and Levin he intended to begin his retirement on that date, they implored him to delay his retirement. Levin, Cohen was told, was leaving Martin's to become president of a bank and Cohen was needed to help train his successor. In addition, Cohen was asked to remain to assist the auditors to complete their annual financial report, and was told by Zeitz that his continued presence was essential. Cohen agreed to defer his retirement until March 31, 1973. Cohen also agreed to make himself available to Martin's whenever his expertise was requested on financial matters.

Before Cohen retired, he and Zeitz computed the pension benefits he would receive in accordance with the formula of the April 28 letter agreement. Cohen testified that these computations were made on the face of the letter agreement, and confirmed by Zeitz as indicated by the notation "As agreed." This agreement provided for annual benefits of $13,760, which Zeitz rounded off to $1,150 each month. Martin's does not dispute that it paid pension benefits to Cohen on the basis of this formula until the termination of pension benefits in January, 1978.

On March 31, 1973, Cohen retired from Martin's and began receiving pension benefits of $575 twice a month. After he retired, Cohen frequently returned to the Martin's stores to visit his former colleagues and to furnish advice on financial matters. From the date of his retirement to September 23, 1977, Cohen consulted with officers and employees of Martin's on fifty-one occasions. Cohen asserts that, in general, after his retirement he continued to advise Martin's on those matters he had been involved with prior to retiring. According to the testimony of Manford Panzer ("Panzer"), who since June, 1968 was Treasurer and Vice President of Martin's, on these occasions Cohen gave advice principally to Zeitz and Rosenthal. The advice related to financial reports, lease and loan negotiations, prospective store sites, cash flow projections, insurance matters, computer conversions, and the establishment of accounting procedures and selection of outside accountants. Ironically, Cohen was also consulted regarding the sale of the company, and it was this sale which led ultimately to the termination of his retirement benefits.

It is unclear whether the visits by Cohen were requested by Martin's. Cohen testified about several reports he prepared at Rosenthal's request, as well as advice fur-

---

4. Plaintiff initially commenced this action seeking recovery under his alleged oral agreement with Zeitz, or alternatively, on the premise that the April 28 letter agreement, either standing alone or as a modification of the Executive Pension Plan, was subject to the provisions of ERISA. In a decision dated July 1, 1980, Judge Charles Stewart granted Martin's' motion for summary judgment and dismissed the original complaint. Judge Stewart ruled that the April 28 letter, both on its own terms and as a modification of the existing pension plan, was not covered by ERISA, and that ERISA "specifically exclude[s] an (sic) plan 'which is unfunded and which is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.' 29 U.S.C. §§ 1101(1) and 1321(b)(6)." Judge Stewart also dismissed the complaint because the agreement upon which plaintiff sought recovery did not satisfy the requirements of the New York Statute of Frauds. N.Y.Gen. Obl.Law § 5–701(a) (McKinney).

nished upon request on specific problems.[5] Rosenthal, however, testified that, although on several occasions he sought Cohen's advice, the bulk of these post-retirement conversations were unrelated to the company's business. Rosenthal stated that Cohen returned to the stores on his own initiative and primarily to socialize with his former coworkers. In addition, Panzer testified that while Cohen occasionally called to alert the Martin's staff that he would visit the store, he generally arrived without advance notice.

It is uncontroverted that Cohen received no compensation or reimbursement in connection with the post-retirement services he rendered to Martin's. It is also undisputed that there was no written agreement regarding Cohen's post-retirement affiliation with the company, and that at no time after his retirement was Cohen provided office space at Martin's. Cohen explained that he performed these services because of his warm friendship with Zeitz and Cohen's belief that these services were part of the *quid pro quo* for his supplemental pension benefits. However, Cohen and his wife did continue to receive group medical and hospitalization coverage, as well as the employee discount at the company's stores.

Martin's has presented several additional factors to indicate that, during this period of post-retirement consultations, Cohen was merely a retiree who paid regular visits to his former place of employ. Throughout this period Cohen reported his pension payments on his taxes as retirement income, and never declared these payments as earnings or wages derived from employment. On at least five occasions when applying for credit, he referred to himself as "a retired executive who had been employed by Martin's." Cohen conceded on cross examination that he never referred to himself during this period as an employee of Martin's.

In addition, Martin's identified Cohen on its payroll books as a pensioner.

On May 25, 1977 Zeitz died. Shortly thereafter, on October 14, 1977, Seedman Merchandising Group purchased 99% of the issued and outstanding common stock of Martin's. On January 16, 1978, the new Board of Directors terminated the Plan "due to the suffering of substantial losses by the company." Thereafter, Cohen received no further pension benefits.

## DISCUSSION

ERISA, enacted in 1974, is a comprehensive legislative scheme requiring that employee pension plans maintain "minimum standards ... assuring [their] equitable character ... and financial soundness." 29 U.S.C. § 1001(a). The statute sets forth, *inter alia*, requirements for private retirement plans to ensure that employees attain vested rights to benefits after a prescribed period of service. 29 U.S.C. § 1053. Thus, as emphasized in House Conference Report No. 93–1280, U.S.Code Cong. & Ad.News 1974, p. 4639, under § 1053, except for certain exemptions not relevant to the present litigation, "an employee's rights, once vested, are not to be forfeitable for any reason." 1974 U.S.Code Cong. & Ad.News 5038, 5052. *See Keller v. Graphic Systems of Akron, Inc.*, 422 F.Supp. 1005, 1008 (N.D. Ohio 1976). ERISA expressly provides for private civil enforcement of its terms by a "participant ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).[6]

Cohen's claim that the termination of his retirement benefits violates ERISA is ap-

---

**5.** At Rosenthal's request, Cohen prepared a written report regarding proposed changes in the Fulton Street Mall, an analysis of a bank credit agreement, and a recommendation concerning a loan agreement which Rosenthal sent him to review. In addition, Cohen inspected proposed sites for new store locations.

**6.** A "participant" is defined in § 1002(7) as: any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer....

parently predicated on § 1053[7], which provides in relevant part:

(a) Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.

(1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.

(2) A plan satisfies the requirements of this paragraph if it satisfies the requirements of subparagraph (A), (B) or (C).…

(A) A plan satisfies the requirements of this subparagraph if an employee who has at least 10 years of service has a nonforfeitable right to 100 percent of his accrued benefit derived from employer contributions.

Cohen's claim is that his right to pension benefits is nonforfeitable[8], and that accordingly, the action of the Board of Directors in terminating his benefits violated ERISA.

Martin's argues that the protections of ERISA are not available to Cohen because: (1) Cohen is not entitled to the protection afforded by the vesting provisions of the statute as he was not an employee on January 1, 1976, the date those provisions became effective; (2) the Plan is limited to employees on the Executive Payroll and since Cohen was on the Private Payroll, he is not included in the Plan[9]; and (3) the Plan is exempted from the protective provisions of ERISA insofar as it is "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1101(a)(1) and 1321(b)(6).

### A. Cohen's employment status on January 1, 1976.

Section 1061 governs the effective date of ERISA. It provides that where a plan is in existence on January 1, 1974, the protections of § 1053 apply only to plan years commencing after December 31, 1975. 29 U.S.C. § 1061(b)(2). Section 1053 refers to an "employees" right to his retirement benefits. Thus, the threshold issue is whether Cohen was employed by Martin's on January 1, 1976 so as to bring him under the protective umbrella of ERISA.[10] See *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*, 439 U.S. 551, 557 n. 10, 99 S.Ct. 790, 795 n.10, 58 L.Ed.2d 808 (1979); *Fremont v. McGraw-Edison Co.*, 606 F.2d 752 (7th Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980).

Martin's position is that Cohen was not an employee as of January 1, 1976 when the vesting and nonforfeiture provisions came into effect, and thus he cannot invoke the protections of ERISA to recover pension benefits.[11] Cohen argues that he performed

---

**7.** The amended complaint and the papers filed by Cohen do not identify with specificity the basis for his claim under ERISA.

**8.** Under ERISA, the term "nonforfeitable" is defined as "a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan …" 29 U.S.C. § 1002(19).

**9.** For the reasons set forth *supra*, at footnote 1, the court finds that this argument is without merit.

**10.** After Judge Stewart dismissed Cohen's original complaint, Cohen moved pursuant to Fed. R.Civ.P. 15(a) and (c) to amend his complaint to state a claim for relief under ERISA. Martin's cross-moved for summary judgment pursuant to Fed.R.Civ.P. 56 on the ground that Cohen was not an employee when the vesting provisions became effective. In a decision dated April 7, 1981, Judge Stewart granted the motion to amend the complaint, and denied the motion for summary judgment, ruling that while only persons who were employed on or after January 1, 1976 are protected by § 1053, "there is a factual question that remains to be determined regarding plaintiff's employment status on January 1, 1976." Subsequently, this case was transferred to and tried before this court.

**11.** Martin's framing of the issue apparently concedes that a retired individual may still be an "employee" in order to trigger the vesting provisions of § 1053. The court is not certain that Congress intended such a broad construction of employment for purposes of § 1053.

substantial duties for Martin's by rendering financial advice from 1973 to 1977, and therefore was an employee of Martin's after January 1, 1976 for purposes of ERISA.

The statutory definition of an employee is unilluminating. Section 1002(6) defines an employee as "Any individual employed by an employer." Thus, the court must look to other constructions of that term in analogous settings. In *Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820 (7th Cir. 1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981), the only case which discusses the definition of an employee under ERISA, the Seventh Circuit applied the common law master-servant test.

In *United States v. Silk*, 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757 (1947), however, the Supreme Court stated that the definition of the term "employees" in federal legislation is a federal question addressed to the purpose of the legislation. The Court, in construing the term "employees" in connection with the Social Security Act stated that:

> The problem of differentiating between employee and an independent contractor, or between an agent and an independent contractor, has given difficulty through the years before social legislation multiplied its importance.... The word "employee" ... [is] a federal problem to be construed "in the light of the mischief to be corrected and the end to be attained." ... "the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act." *Labor Board v. Hearst Publications*, 322 U.S. 111, 120, 123, 124, 128, 129, 131 [64 S.Ct. 851, 855, 856, 857, 859, 860, 88 L.Ed. 1170].

*Id.* at 713, 67 S.Ct. at 1468.

In *Silk*, the Court rejected the test set forth in the *Restatement of Agency*, § 220 (1933), that an employee is one over whom another has "power of control, whether exercised or not, over the manner of performing service to the industry." The *Silk* court held that in addition to the degree of control, opportunities for profit or loss from the activities, investment in the facilities for work, the permanency of the work relation, and the skill required were also factors which should enter into the judicial determination of coverage under the Social Security Act. 331 U.S. at 716, 67 S.Ct. at 1469. *See Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947) (applying the *Silk* factors in connection with the Social Security Act); *Carroll v. American Federation of Musicians of United States and Canada*, 241 F.Supp. 865, 889 (S.D.N.Y.1965), *modified on other grounds*, 372 F.2d 155 (2d Cir. 1967) (apply-

---

Generally, an individual's employment status terminates upon retirement. The instant case presents a somewhat novel situation as it is contended that an individual maintained employment status after retirement, and up until the date that § 1053 vested.

Section 1053 states that "Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable ...." Clearly, employment status of some sort is required at the time § 1053 vests. *See Fremont v. McGraw-Edison Co.*, 606 F.2d 752 (7th Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980). Typically, § 1053 applies to a situation where the work being performed by an employee entitles that employee to participation in a pension plan. Section 1053 then requires that the pension plan meet certain minimum standards.

The question not raised by the parties is whether there must be a nexus between the employment status and the pension plan, that is, whether the continued employment must be covered by the pension plan. Section 1053 does not give employees vested pension rights if they are not covered by a pension plan. Rather, the section requires that plans *covering employees* meet certain minimum standards. Cohen was covered by Martin's' pension plan on the vesting date of § 1053 in 1976, but unquestionably as a retiree and not as an employee. Even assuming that Cohen's post-retirement efforts on behalf of Martin's were those of an employee, there is no contention that Martin's' pension plan covered such employment activity. Thus, there is an open question as to whether § 1053 vests rights in a pension as a result of employment not covered by the pension plan. Because of the court's finding on Cohen's employment status, *infra*, this issue need not be resolved.

ing the *Silk* factors under the Norris-La-Guardia Act).

In *Avis Rent A Car System, Inc. v. United States*, the Second Circuit analyzed the Supreme Court's opinions in *United States v. Silk, supra,* and *Bartels v. Birmingham, supra,* and concluded that at least seven factors were relevant in determining whether an individual was an employee or an independent contractor. 503 F.2d 423, 429 (2d Cir. 1974). The court in *Avis* supplemented the *Silk* factors with the following factors: (1) the undertaking of a substantial cost to perform the service; (2) the opportunity for profit depending on one's management skill; and (3) whether the services rendered are in the course of the recipient's business, rather than in some ancillary capacity. *See Mav Freight Service, Inc. v. United States,* 462 F.Supp. 503, 507 (E.D.N.Y.1978) (applying *Avis* factors in determination of employee status under Federal Insurance Contributions Act).

The determination of which factors are relevant to a finding of employment status under ERISA must consider the remedial purposes of the legislation. As the Supreme Court stated in *Silk* :

> [T]he terms "employment" and "employee," are to be construed to accomplish the purposes of the legislation. As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose.

331 U.S. at 712, 67 S.Ct. at 1467. ERISA was adopted to remedy perceived inadequacies in pension plans, *see Nostrame v. Consolidated Edison Co. of New York,* 504 F.Supp. 507, 510 (S.D.N.Y.1980), by ensuring "the equitable character of such plans and their financial soundness." 29 U.S.C. § 1001(a). These interests, however, must

be balanced against Congress' intention not to jeopardize the financial integrity of pension plans. *See Riley v. MEBA Pension Trust,* 570 F.2d 406, 413 (2d Cir. 1977); H.R.Rep.No. 93–807, U.S.Code Cong. & Ad. News 1974, p. 4639, 1974 U.S.Code Cong. & Ad.News 4670, 4723.

■ In light of the underlying purposes of ERISA, and the criteria identified in the *Silk* and *Avis* decisions, the court is of the opinion that in determining employment status under § 1053 the following factors are relevant: (1) the degree of control or supervision; (2) the existence and nature of the remuneration for services rendered; (3) the permanency of the relationship; (4) whether the services were rendered in the normal course of business; and (5) conduct on the part of the parties evidencing an employment relationship.

■ After considering these factors and the policies underlying ERISA, the court finds that Cohen was not an "employee" of Martin's after his retirement. None of the indicia of employment status are present here. In evaluating the standards relating to the determination of employment status, the right to control is the most salient factor. *See Crown Central Petroleum Corp. v. Cosmopolitan Shipping Co.,* 602 F.2d 474, 477 (2d Cir. 1979); *Lodge 1858, American Federation of Government Employees v. Webb,* 580 F.2d 496, 504 (D.C.Cir.), *cert. denied sub nom. Lodge 1858, American Federation of Government Employees v. Frosch,* 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 319 (1978); *Joint Council of Teamsters No. 42 v. N.L.R.B.,* 450 F.2d 1322, 1326–27 (D.C.Cir.1971); *Danielson v. Local 814, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 355 F.Supp. 1293, 1297 (S.D. N.Y.1973).[12] After Cohen retired in March,

---

**12.** The definition of the employer-employee relationship promulgated by the Secretary of the Treasury under the *Social Security Act* underscores this point:

> (a) *General.* The common-law rules on employer-employee status are the basic test for determining whether you and the person or firm you work for have the relationship of

employee and employer.... In general, you are a common-law employee if the person you work for may tell you what to do and how, when, and where to do it. The person or firm you work for does not have to give these orders, but needs only the right to do so. Whether or not you are a common-law employee is not always clear. Several as-

1973, he was never under the control or supervision of anyone at Martin's. The vast majority of Cohen's post-retirement contacts with Martin's consisted of unsolicited consultations with his former colleagues. Martin's placed no restrictions of any nature on his time, working hours or responsibilities. With respect to the few limited projects which Cohen undertook at Martin's request, there is no evidence that Martin's exercised any control over Cohen in the manner in which he performed these tasks. Requesting the performance of a specific service, with the right to reject the result, is not the type of supervision to support a finding of an employment relationship. *See Lodge 1858, American Federation of Government Employees v. Webb, supra,* 580 F.2d at 505. Thus, there is no support in the record for a finding that Martin's retained any control or supervision over Cohen during this time.

Another important consideration is the existence of any remuneration for services. By his own admission, the payments and benefits Cohen received after retirement were not conditioned upon his performing any services to the company. Cohen testified that he performed these services out of a sense of obligation to the company and its owners. In addition, Cohen did not have a consulting agreement with Martin's after his retirement. The gratuitous performance of work for another militates against the finding of an employment relationship. *See Ranger Insurance Co. v. Mercantile Trust Co.,* 363 F.Supp. 795, 801 (E.D.Mo. 1973).

Another important criterion is the permanency of the relationship. In the present case, the relationship was transitory and indefinite. There was absolutely no understanding or agreement as to the duration of Cohen's service. In addition, under the *Avis* framework, the fact that Cohen did not work "in the course of the recipient's business," but rather in an ancillary capacity, indicates that he was not an employee.

There are other aspects of the parties' conduct which support the finding that Cohen was not an employee after his retirement. After Cohen's retirement Martin's never withheld any income taxes or social security payments for him. *See Wardle v. Central States, Southeast and Southwest Areas Pension Fund, supra,* 627 F.2d at 826; *Danielson v. Local 814, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, supra,* 355 F.Supp. at 1298. Martin's also did not provide him with a place to work and listed him as a retiree on their records, rather than as an employee. In addition, Cohen reported his pension benefits as retirement rather than employment income, and he referred to himself as a retired executive rather than as an employee.

*B. Retroactive application of the vesting provisions.*

■ Cohen raises an alternative argument for entitlement to his pension benefits. Cohen contends that even if he is not an "employee" for ERISA purposes on the date the vesting provision became effective, ERISA protects all retired employees who receive benefits after the effective date of

---

pects of your job arrangement are considered in determining whether you are an employee or are self-employed under the common-law rules.
(b) *Factors that show employee status.* Some aspects of a job arrangement that may show you are an employee are as follows:
(1) The person you work for may fire you.
(2) The person you work for furnishes you with tools or equipment and a place to work.
(3) You receive training from the person you work for or are required to follow that person's instructions.
(4) You must do the work yourself.
(5) You do not hire, supervise, or pay assistants (unless you are employed as a foreman, manager or supervisor).
(6) The person you work for sets your hours of work, requires you to work full-time, or restricts you from doing work for others.
(7) The person you work for pays your business or traveling expenses.
(8) You are paid by the hour, week or month.
20 C.F.R. § 404.1007 (1981).

the vesting provision irrespective of the date of retirement.[13] In effect, Cohen argues for retroactive application of § 1053 where an employer has made payments after the effective date of that section. Thus, under this interpretation, once Martin's paid benefits to Cohen after January 1, 1976, his rights which otherwise would not have been protected became vested. This construction is not supported by the weight of authority.

In *Fremont v. McGraw-Edison Co.*, 606 F.2d 752 (7th Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980), the Seventh Circuit expressly resolved this question, holding that "for § 203 [29 U.S.C. § 1053] to apply, one must be an employee after its effective date. . . ." *Id.* at 758. In *Fremont* the court found that a former employee who attained his normal retirement age and retired before January 1, 1976 could not invoke the vesting provisions of § 1053:

> We cannot agree that the date a former employee is denied his request for benefits is the relevant date for determining the applicability of § 203 [29 U.S.C. § 1053] if the former employee was not employed after the effective date of § 203. The language of the statute belies such an interpretation. It merely says that effective January 1, 1976, each pension plan shall provide that an *employee's* right to benefits is nonforfeitable. We agree with the district court that § 203 only protects against forfeiture the benefits of those who are in an

employee status on January 1, 1976, or thereafter.

*Id.* at 755.

In reaching this result, the *Fremont* court analyzed the legislative history of the vesting provisions and determined that it was not Congress' intention that the vesting provisions would apply to former employees who received benefits after ERISA's effective date. Specifically, the court noted that:

> Early drafts of § 203 [29 U.S.C. § 1053] extended the vesting provisions to include "participants," defined in ERISA to include former employees, 29 U.S.C. § 1002(7), but the section which was ultimately enacted is restricted to "employees." *See* Senate Bill S. 4 [Report No. 93–127], 93d Cong., 1st Sess. at 509–514, U.S.Code Cong. & Admin.News 1974 p. 4639. If Congress had intended § 203 to affect interests of former employees, it would have used the term "participant."

*Id.* at 755 n.3. Thus, it is clear that the drafters limited the coverage of the vesting provisions to employees rather than participants.[14] Accordingly, under *Fremont*, Cohen cannot claim the benefits of ERISA since he was not an employee when the vesting provisions became effective.

Courts have uniformly held that ERISA's vesting provisions are not to be retroactively applied and can be invoked solely by persons who were employed on the date these provisions became effective. In *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*, which held that an employee who retired before the effective date

---

**13.** In the April 7, 1981 decision in this matter Judge Stewart implicitly rejected this position in holding that "[u]nder 29 U.S.C. § 1061(b)(2) (1974) only those persons who were employed on or after January 1, 1976 are covered by the vesting *provisions contained in* 29 U.S.C. § 1053 (1974)."

**14.** Committees in both houses of Congress clearly expressed an intent to limit the vesting provisions to employees active on the effective date. In its report to the Senate, the Committee on Labor and Public Welfare stated: "the vesting benefits . . . are applicable only to those active employees who are covered by the

plan on the effective date . . . ." Sen.Rep.No. 93–127, 1974 U.S.Code Cong. & Ad.News p. 4639, 4838, 4856. The House Ways and Means Committee specifically rejected

> retroactive vesting for employees who have already terminated their service with the employer, since this would create a substantial unexpected cost for the plan (thereby possibly jeopardizing the size of benefits for employees still covered under the plan) and might involve serious recordkeeping problems.

H.R.Rep.No. 93–807, 1974 U.S.Code Cong. & Ad.News 4670, 4723.

of ERISA cannot claim the benefits of ERISA, the Supreme Court suggested that the retirement date is the critical date for determination of the applicability of the vesting provisions. 439 U.S. 551, 557 n. 10, 99 S.Ct. 790, 795 n. 10, 58 L.Ed.2d 808 (1979). *See Sidran v. Pressmen's-Publishers' Pension Fund*, 79 Civ. 3919, slip op. (S.D.N.Y. April 16, 1980). In *Haeberle v. Board of Trustees of Buffalo Carpenters Health-Care, Dental, Pension and Supplemental Funds*, 642 F.2d 1132 (2d Cir. 1980), the Second Circuit held that ERISA was inapplicable to a claim by a former employee who forfeited his previously earned pension credits one day prior to the effective date of the vesting provisions. *Id.* at 1137. Similarly, in *Schlansky v. United Merchants and Manufacturers, Inc.*, 443 F.Supp. 1054 (S.D.N.Y.1977), the court rejected a claim that ERISA's vesting provisions protected the pension rights of an employee who was discharged prior to the effective date of § 1053. *Id.* at 1064.

Other courts have rejected claims seeking to invoke ERISA's vesting provisions when employees' interests have been terminated prior to the effective date of § 1053. *See Nostrame v. Consolidated Edison Co. of New York, supra*, 504 F.Supp. at 512 (employee resigned five months before plan became effective; court held "§ 1053 provides no aid to plaintiff because it cannot be applied retroactively...." *Id.* at 512); *Employee Benefits Committee v. Pascoe*, 504 F.Supp. 958, 964 (D.Hawaii 1980) (prior to effective date of § 1053, widow received lump sum payment of husband's contribution to plan; court held ERISA inapplicable to post-1976 offset claim by employer from workmen's compensation award to widow); *Fox v. Merrill Lynch & Co.*, 453 F.Supp. 561, 566 (S.D.N.Y.1978) (citing *Schlansky* for the proposition that the vesting provisions are inapplicable to claims by persons who left their employment with the plan sponsor before the end of 1975); *Keller v. Graphic Systems of Akron, Inc.*, 422 F.Supp. 1005, 1009 (N.D.Ohio 1976) (claim arose after enactment of ERISA, but before effective date for vesting provisions; ERISA held to be inapplicable).

Cohen relies on the decision of the Second Circuit in *Riley v. MEBA Pension Trust*, 570 F.2d 406 (2d Cir. 1977) ("*Riley I*"), and its subsequent decision following remand to the district court in *Riley v. MEBA Pension Trust*, 586 F.2d 968 (2d Cir. 1978) ("*Riley II*"), to counter the above-cited authorities. Cohen's reliance on these decisions is misplaced.

*Riley I* involved a construction of § 1053(a)(3)(B)(ii), dealing with the suspension of retirement benefits because of subsequent employment with another employer in the same industry. The issue of whether ERISA applied to a person not employed by the plan sponsor on the effective date of the vesting provision was not addressed by counsel or by the District Court. The Court of Appeals, considering the applicability of these vesting provisions, concluded that since § 1061(b)(2) delayed the effective date of the vesting provisions until January 1, 1976, Riley's entitlement to benefits accrued after that date. Thus, ERISA would apply to benefits suspended after January 1, 1976, but would not apply retroactively to benefits suspended prior to January 1, 1976. *Riley I* at 411. The court also held that if Riley's benefits had been completely forfeited rather than merely suspended prior to January 1, 1976, then ERISA would not apply. *Id.*

In *Riley II*, the sole issue involved a recently enacted regulation stating that the nonforfeiture provisions of § 1053 are not applicable to persons who retire before their normal retirement age. The court stated that its earlier determination in *Riley I* that Riley's rights had become nonforfeitable "reflected the then agreement of the parties and was not a determination of law by the court." 586 F.2d at 970. Thus, Cohen's reliance on *Riley I* and *Riley II* is misguided: first, those cases involved a construction of § 1053(a)(3)(B)(ii), dealing with the suspension of benefits, rather than the vesting provisions operative in the instant case; second, to the extent that *Riley I* suggests that an employee's retirement prior to January 1, 1976 does not bar the application of ERISA to benefits accruing thereafter, the

court's subsequent disclaimer in *Riley II* of that statement substantially limits its precedential value; and finally, the court in *Riley II* ultimately decided that ERISA would not apply to protect Riley's pension benefits. *Id.* at 970–72.

In conclusion, the mere fact that Martin's paid benefits to Cohen following the effective date of § 1053 does not transform unvested rights to vested ones. As demonstrated by the legislative history and as indicated by the case law, Congress carefully chose the term "employees" over "participants" to exclude former employees from the vesting provisions. Therefore, the controlling factor is whether the claimant was an employee eligible to receive pension benefits on the date the plan vested under ERISA.

By reason of the foregoing, it is clear that Cohen's claim under ERISA must fail.[15] In the final analysis, this is a case of corporate callousness and exploitation for which there is no legal remedy. Congress, for whatever reasons, did not provide protection for those like Cohen—a devoted "company man," who, after forty-three years of service, saw his expectations of a comfortable retirement succumb to harsh business decisions which consider only profits and not service.

## CONCLUSION

Cohen has failed to sustain his burden with respect to his claim under ERISA. Accordingly, Martin's is entitled to judgment on the merits.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

**15.** Since ERISA is not applicable, the court need not address Martin's' argument that the Plan is not covered by ERISA because of the exemption for deferred compensation plans for highly compensated employees. 29 U.S.C. §§ 1101(a)(1) and 1321(b)(6).