Jack MARTINO, Leigh J. Cronland, Terry Rivera, Jose Herrera, individually and on behalf of others similarly situated, Plaintiffs,

v.

Jim CAREY, Sheriff of Umatilla County, Oregon; Woody Starrett, Bob Ten Eyck, and Bud Draper, County Commissioners, Umatilla County, Oregon, all sued in their individual and official capacities and their successors in office, Defendants.

Civ. No. 81–751–RE.

United States District Court, D. Oregon.

Feb. 1, 1983.

Roy S. Haber, Eugene, Or., for plaintiffs.

Harold A. Fabre, Douglas R. Nash, Pendleton, Or., for defendants.

## OPINION

REDDEN, District Judge:

The plaintiffs, a class composed of persons incarcerated in the Umatilla County Jail, brought this suit against the Sheriff and County Commissioners of Umatilla County, alleging that the conditions of confinement in the Umatilla County Jail violate rights guaranteed to them by the First, Eighth and Fourteenth Amendments to the Constitution of the United States. The plaintiffs allege that those conditions violate the minimum standards prescribed by the Constitution.

The plaintiffs allege that these conditions violate the minimum standards prescribed by the Constitution in the following ways:

1) The lack of security at the jail is such that many inmates are in danger of attack from other, more violent inmates,

2) The lack of medical care is such that inmates suffer from illness and pain without treatment, despite their efforts to get medical care,

3) The conditions of confinement are inhumane and indecent, in that prior to the filing of the action, feces, urine and vomit were allowed to overflow from the toilets onto the floor and onto inmates, creating risks of disease as well as inflicting needless suffering on the prisoners; that there was a lack of sanitation and hygiene at the jail which further increased the risk of disease; that there was until recently an almost total lack of recreation and exercise at the jail, with prisoners being in "lockdown" essentially all day every day; that the cells were not heated sufficiently in winter to maintain the health of inmates; that there was no cooling or ventilation in summer,

resulting in stifling, tomb-like conditions; that there was arbitrary censorship of mail, without required safeguards; that prisoners were denied the required due process in jail disciplinary proceedings; that prisoners are denied access to the courts because defendants do not allow free access to the law library located in the same building as the jail; and that the conditions complained of amounted to cruel and unusual punishment.

I agree with plaintiffs that these conditions existed at the Umatilla County Jail at the time of filing and that these conditions violated the civil rights of the persons incarcerated there. Some of those conditions existed, or were inadequately remedied, at the time of trial.

In this opinion, I will first recount briefly the relevant aspects of the procedural history of this case. I will then describe the conditions of confinement at the Umatilla County Jail as I have found them to be. I will then briefly summarize the applicable legal principles which I apply in reaching my conclusions. I will then specifically discuss the separate claims of the plaintiffs which have been summarized above in light of the facts I have found and the law I am required to apply.

## I. Procedural History of the Case

The complaint was filed August 17, 1981. The suit was brought pursuant to 42 U.S.C. § 1983 and the Constitution of the United States. On November 5, 1981, the Court held a conference of all parties in Pendleton, Oregon, where the Umatilla County Jail is located. The Court granted certification to the class pursuant to Fed.R.Civ.P. 23(b), ordering that the notice of class be posted in the cells of the jail. The Court, accompanied by counsel, visited the jail on that date and noted the conditions then in existence.

The parties proceeded with discovery. On April 1, 1982, I granted the plaintiffs' motion to strike the defendants' jury demand, holding that a suit challenging jail conditions and seeking only injunctive relief should be tried to the court and not to a jury. On July 2, 1982, I granted the plaintiffs' motion for interim relief pending trial, and ordered that the defendants provide outdoor exercise in the rooftop recreation area of the jail for one hour a day, five days a week; that defendants provide the necessary staffing for the jail so that the security of inmates could be maintained on a 24-hour basis; that the defendants provide means for the ventilation of the cells during the summer, and that the temperature of the water in the showers not be maintained at a level which would scald inmates.[1]

Before listing the several claims made by plaintiffs, I will provide some background information in an attempt to explain the rather unusual situation which this case presented: litigation of the constitutionality of conditions in a county jail which was scheduled for a major renovation which, together with other planned changes, would likely obviate many if not all of the challenged conditions. Since early 1981 which marked the commencement of Sheriff Carey's term, improvements for certain problem areas were considered, planned and, in some instances, implemented. Plans for a new or renovated jail have been under consideration for many years, with "citizen committee" participation pre-dating Carey's election.

This action was filed August 17, 1981 and the evidence which I will subsequently discuss indicates that further improvements were thereupon implemented. Plans for construction or renovation were revised and expedited. I urged the parties to consider this state of affairs and agree to a settlement which would acknowledge that many of the challenged conditions were to be remedied with or without litigation and judgment. I urged settlement because it was apparent that many of the complaints would be remedied regardless of the nature

---

1. Although defendants at that time were affording such relief voluntarily, they declined to agree to continue to do so, taking the position that they were not required to so act and that such an agreement would, therefore, constitute some sort of an admission. I therefore entered the order.

of the court's judgment, and that the parties could enter into a consent decree without requiring defendants to admit that the filing of the lawsuit was the action that precipitated the changes. The defendants, however, concluded that settlement was undesirable and insisted that plaintiffs be put to their proof that any existing conditions, at the time of the filing of the action, were unconstitutional. I hope to adequately distinguish the conditions between those which existed prior to the filing of the lawsuit, and those which existed thereafter. Inasmuch as many of the criticized conditions emanate from inadequate facilities, it will be worth bearing in mind that those will be alleviated by the renovation currently underway. It is puzzling that litigation was necessary, but the defendants are as entitled to their day in court as are the plaintiffs.

On September 1 and 2, 1982, the case was tried to the Court. The Court on September 2, 1982, accompanied by counsel, made another inspection of the jail and confirmed the fact that the defendants were complying with the interim relief order.

## II. *The Facts of Confinement at the Umatilla County Jail*

These are the conditions which existed at the Umatilla County Jail prior to the filing of the complaint in this case.

The jail was constructed in 1956. It occupies the top floor of the Umatilla County Courthouse. It is located adjacent to the main office of the Sheriff's Department. Most prisoners are housed in "dormitories" with eight to fourteen beds.

### A. *Security*

The security provided inmates at the jail against assaults by other inmates is clearly inadequate. Prisoners are separated from guards in the sheriff's office by multiple locked security doors. There are no surveillance cameras aimed at the cell interiors and no regular rounds are made by guards. To get assistance an inmate must be heard in the adjacent sheriff's office, rely on a guard to respond and wait for that response. In documented cases, in the past, this "security" system has proved to be totally inadequate. Prisoners have been attacked and injured while the sheriff's office was unable to respond. Prior to the filing of the complaint there was an almost total lack of security at night. The cells would be closed and the guards would retire to the office. On many occasions there was only one guard present in the jail, which held as many as seventy prisoners on occasion. On one documented occasion, a prisoner was attacked and was able to yell for assistance and be heard. However, only one guard was on duty and he was under instruction not to enter the cells alone. Therefore, the guard could not render immediate assistance, but first had to summon help from the outside by radio, before he was able to render assistance. The inmates of the jail are aware of the security problem and aggressors take advantage of it to terrorize other inmates. There were no written policies or rules instructing guards what to do in the event of security breaches or emergencies. During this period the individual judgment or inclination of the guard on duty was the only guide.

There is no provision for classification of prisoners. Dangerous or violent inmates shared cells with persons awaiting trial for minor offenses. At the time of trial, a person awaiting trial for the rape of a child was housed in the jail, and was not segregated from young inmates accused of misdemeanors. A document has been promulgated since the filing of the complaint which states classification as a goal. However, this document cannot be complied with due to space limitations. The inmates accused or convicted of violent crimes, or inmates who are large and aggressive, become the "cell bosses." They dominate the other occupants of the cell by violence and thereby maintain their control. The security situation at the jail does not allow corrections personnel to remedy that situation. According to the testimony of several inmates and ex-inmates, assaults and beatings occur regularly. If inmates complain to officials, they are labelled "snitches" and

will "pay" later, when assistance is not available.

In the event of a major emergency such as a riot, escape or fire, the level of staffing at the jail would have been inadequate to protect human life.

I find from these facts, and the inaction of defendants despite their awareness of these conditions, that defendants manifest deliberate indifference to the safety of inmates incarcerated in the jail.

### B. *Medical Care*

The level of medical care which has been provided to inmates during periods prior to the filing of the complaint was inadequate. There was no medical screening of inmates upon their admission to the jail. There was no examination for communicable diseases such as venereal diseases, skin diseases or body lice. There was no written procedure or guide for the guards which instructed them what to do when an incoming inmate suffers from disease or injury. There was no written protocol designating the various medical providers and their functions. The "chief medical authority" at the jail, Dr. Boss, is an "outside" physician. He does not consider himself the medical authority at the jail but only an advisor to the sheriff and his staff. He is employed full-time by the emergency room at the local hospital and cannot devote extensive time to the jail. Dr. Boss had not read the document entitled "Policy and Procedure Manual" which purports to govern the medical procedures at the jail, and he was generally unaware of its contents. Apparently this document is still in "draft" form, and the

doctor had not had time to review it since its promulgation. Dr. Boss was generally unaware of the treatment given to inmates at the jail by the jail nurse. He was unaware of her specific actions and the specific drugs she prescribed. There is no manual or protocol to guide the nurse and she operates in an essentially autonomous manner; Dr. Boss knew little about the treatment she gave to inmates. There were no medical files kept on prisoners to document the treatment they received at the jail. Although the nurse's actions might be against sound medical practice, inmates have no recourse to Dr. Boss. On one occasion, an inmate entered jail with a pill prescription from his private physician which should have been taken once every four hours. The nurse changed the prescription to once every eight hours. When the inmate complained of the change, he was put in disciplinary segregation as a punishment.

The nurse is essentially the health care system at the jail. Further, there is no written policy requiring sick call or other reporting of illness or injury by prisoners. A prisoner who is ill must send a "kite," i.e., a note, to a jailer. The jailer then decides whether to let the inmate see the nurse. The nurse then decides whether to let the inmate see a doctor. None of these decisions are guided by protocols or based upon a qualified diagnosis. Testimony indicated that guards occasionally disregarded notes from inmates. This system amounts to "deliberate indifference" to the health of inmates.[2]

Specific incidents will be recited here to indicate the nature and extent of the prob-

---

2. Dr. Boss volunteered to take care of jail patients two and one-half years ago. He is unpaid. Boss deposition at 95. Apparently prior to that time there was no doctor who regularly saw inmates at the jail. Dr. Boss considers himself to be a "medical advisor," although he is the closest thing there is to a medical authority at the jail. Boss deposition at 13. He testified that this suit had given him the leverage to begin needed improvements in the jail's medical care system. Boss deposition at 12. He noted that inmates at the jail currently have no right to see a doctor unless guards are cooperative. Boss deposition at 62–66. As of January of 1982, six months after this suit was

filed, defendants were still "developing" written procedures informing inmates of their right to medical care. Boss deposition at 92–95. There is no written program for preventive health care at the jail. Boss deposition at 103–104. Dr. Boss testified that the lack of outdoor exercise at the jail was unhealthy, and that he hoped to see this corrected. Boss deposition at 72–75. There was no written procedure for treatment or referral of mental disease at the jail, although such a policy was being developed in January of 1982. Boss deposition at 50–51. Prior to this suit, there were no written records of what the nurse did which Dr. Boss could examine. Boss deposition at 77.

lem under the past and present system. On one occasion, an epileptic inmate fell from his upper bunk to the floor in a seizure. Another inmate yelled for assistance and after five minutes a guard appeared and looked at the situation. He then disappeared and returned about 15 minutes later with another guard. The two guards then decided to transport the epileptic inmate to the hospital.

Because there was no intake examination, no one was aware the inmate suffered seizures. There were inadequate personnel on duty and an expedited and adequate response was impossible. First, it was necessary to attract the attention of the guard on duty who was then required to radio another deputy for assistance before entering the cell. Even then, it was the guards who were called upon to determine whether or not the inmate should be transported to the hospital without the assistance of written protocol or health professionals. On documented occasions, guards refused to call the doctor for inmates who claimed to be in pain. One such occasion occurred when an inmate's gums began to bleed and his teeth began to fall out. The guards ignored the complaints for a week until other inmates began to agitate on the victim's behalf. The guard then gave the inmate a pain reliever and when this did not work, finally took him to the hospital. Testimony indicates that such a response to complaints was a regular occurrence.

On another occasion an inmate was suffering from delusions which were diagnosed as delerium tremens by the nurse. She called the hospital for advice and the treatment decided upon was to monitor the inmate's blood pressure every three hours. No other treatment was provided. In another instance, an inmate was examined for alcohol withdrawal symptoms and the nurse's notes indicate dried blood on a wound on the scalp. The nurse noted that she did not "feel" the inmate "is going through severe alcohol withdrawal." The notes do not indicate treatment of the symptoms or examination of the wound.

This last example is an illustration of the fact that the problem exists even when an inmate does reach a health professional. The nurse is competent, but she is not a physician. She is required to make decisions that a physician should render. The nurse was unable to perform physical examinations because of the lack of an examining room. (This condition was remedied following the filing of this action.) In one instance an inmate complained of a "rash" between the legs. The nurse merely inquired as to whether he had venereal disease and accepted the inmate's self-diagnosis that he was not so afflicted. No examination was performed.

There is no screening for mental health problems and no effective way to deal with them when they arise. On one occasion, when an inmate threatened suicide, a guard called a "preacher." Later that evening, that inmate attempted suicide after talking to the "preacher." The guard had no training in diagnosis of mental illness, nor did the "preacher." There was no contact between this inmate and a health professional. There was no directive on the subject and the guards were left to determine, themselves, the best course of action to take.

There is little or no effort at preventive health care or sanitation, although the nurse is aware that the conditions within the cells are deficient and that inmates contract diseases from one another. There is no specific effort designed to insure minimally safe levels of hygiene in the overcrowded cells. No regular physical examinations are conducted. There is no sick call and medical treatment depends upon the "kite" system through the guards. The plaintiffs are required to convince the guard that their problem is severe enough to warrant medical assistance, and some times are unable to do so. Staff shortages make it difficult for guards to transport inmates to the hospital for examination. Inmates are generally dependent for health care upon the guards and the staff nurse.

Expert witnesses testified that the overall level of health care at the jail was inadequate and a manifestation of deliber-

ate indifference to the medical needs of inmates. I must agree with their opinions. The health and lives of inmates have been and are threatened by such conditions. Adequate corrective measures have not been introduced. As stated, the system amounts to deliberate indifference to the health needs of inmates.

### C. *Living Conditions*

Conditions at the Umatilla County Jail have improved since the filing of this suit. Efforts to correct plumbing conditions have met with some success. The type of plumbing which exists at the jail has allowed feces, urine and vomit to overflow from the toilets into the cells on a regular basis. Such filth also backs up into one toilet bowl from others directly connected to it, but located in other cells. This situation was not only degrading but a threat to the health and well being of the inmates. On occasions during summers past the jail has been so hot and airless as to endanger the health of inmates. The cell area is not air conditioned. Windows were not opened but were painted shut. The interior of the jail was so dim that reading was difficult or impossible even in daylight hours. It remains virtually impossible to read during the evening hours, in any of the cells. Odors from overflowing toilets, bodies, cigarette smoke and general staleness nauseated inmates. During past winters the cell areas have been cold enough so that one's breath was visible.

The bars of the cells were not cleaned and were covered with what was commonly called "crud." Minimal sanitation and cleaning was not undertaken. Shower drains clogged because there were no drain covers and water backed up and overflowed from the showers. Inmates complained of skin diseases caused by overflowing waters and filth.

A shower is provided in each "dorm" which is also in public view. A shower curtain is provided. Inmate witnesses testified that the shower curtain was rarely if ever changed, and that the shower drain clogged and overflowed constantly. The inmates' description of the condition of the inside of the shower curtain, and the "material adhering to it" will not be repeated here. Suffice it to say that it would survive no constitutional scrutiny. A simple remedy of a frequently changed shower curtain commenced after the filing of this lawsuit.

An inmate taking a shower would be hit with a blast of water, sometimes hot enough to scald him, when a toilet in an adjacent part of the facility was flushed. Inmates were not provided with toothbrushes or shampoo. No sheets were distributed and only one blanket was available per inmate. Mattresses were distributed to inmates each night, collected and intermingled in the morning and again issued in the evening. No sterilization or cleaning of mattresses was performed. Inmates complained that this encouraged the spread of skin diseases.

Inmates were locked into their cells or dorms all day as there was no recreational activity provided. There was no day room and no place for exercise. The beds occupied most of the cell and dorm space and the remaining space was occupied by the toilets and an adjacent table. Inmates testified that the cell floors were so filthy that they would not do exercises upon them.

At times in the past the jail has been severely overcrowded and such overcrowding has meant an insufficient number of beds. Inmates have been required to sleep on the floors where their mattresses have become wet and contaminated by overflowing water from showers and toilets. Testimony confirmed that this overcrowding has resulted in an increase of violence in the cells.

Many inmates continually feared assault by others. Testimony indicated that inmates who were beaten in one dorm area would be transferred to another, only to have another assault occur. Inmates testified that they did not dare sleep, for fear of an assault.

There is no privacy curtain surrounding the toilets, which are located adjacent to the table and bench. Some inmates could

not adjust to the visible and public toilets. All inmates in the area must view the bowel movements of inmates using the toilets. Inmates complained of stomach pains and cramps because they attempted to "hold" their toilet needs until some of the others were sleeping. When toilets overflowed, they contaminated the cell floors where inmates were required to remain 24 hours a day.

One inmate testified that transfer to a state prison meant improved conditions, but one testified that he was so weak from incarceration at Umatilla County that he could not walk around the track at Oregon State Correctional Institute, when he first arrived.

The following expert testimony was received concerning the effects of the jail on inmates. Dr. Gualitieri stated that "the environment in this jail actually produces physical and mental illness .... It is my opinion that forcing these inmates to live in the environment of this jail is psychological torture and must be terminated with as little delay as possible." Dr. Della Penna stated that "the conditions of defective plumbing, failure to provide adequate heat and ventilation, severe overcrowding, spatial density and lack of intake procedures each and in combination cause a severe threat to the inmates' health and in my opinion evidence deliberate indifference to the health of the prisoners." Dr. Rundle stated, "The conditions described in various documents including crowding into tank cells, toilets which expose the bare bottoms of inmates sitting on them to excrement, scalding showers, lack of privacy, generally insanitary conditions, lack of outdoor exercise are psychologically destructive to all subjected to them .... The Umatilla County Jail is unfit for use. It cannot be made fit by any practical means, although conditions could be substantially improved pending its abandonment."

Conditions at the jail have not been accepted without complaint by Umatilla County Grand Juries. In 1979 one reported:

We find that the jail staff is inadequate to effectively supervise, maintain, and police the present population. Jailors are frequently left alone to supervise as many as seventy prisoners. This ratio of one to seventy is not adequate (would make no difference if it was one to forty). The inability of one deputy to effectively handle a major emergency, such as fire, an escape or riot is evident. Serious potential consequences to inmates, jailors, and public at large are threatened by time delays in bringing additional staff to the jail....

Periodic overcrowding reduces the availability of towels and other personal cleaning items, and also promotes the rapid communication of disease....

Age and lack of funds are not sufficient grounds for perpetuating a curious inability to dispose of trash or to perform minor housekeeping tasks ... Age and lack of funds are also not adequate to explain disorganization, unlocked knife drawers, knee-deep laundry, crusted bars, unbolted paraphernalia, disparity in jailor and matron status, lack of inmate exercise options, uncovered garbage (organic material), lack of ventilation, prevailing odor of garbage and stale air, buckets of dirty mop water left sitting around with no sign of recent disturbance, or use of cleaning equipment ... that were in such a condition that they would introduce more dirt than they would clean up.

In 1980, another Umatilla County Grand Jury found these inadequate conditions:

Grills and bars were filthy. Greasy, fuzzy film covered the cages ... There is not a word to describe the male toilet area but "gross" ... privacy panels should be installed ... because toilets are placed so that other inmates are involuntary witnesses to everyone else's elimination process (which is revolting).

When the Court toured the jail after the instigation of this suit, the walls and bars were newly painted and clean. Inmates testified that the defendants were in so much of a rush to accomplish these tasks after the filing of the suit that filth was

simply painted over since there was no time to clean up. The defendants have also removed the paint which covered the windows and have been able to open some of them, which has improved the lot of inmates a great deal. Large fans are used in the heat of summer. The Court has also, as previously stated, ordered the defendants to maintain certain minimal standards at the jail in an interim order.

I agree with the expert testimony and the reports of the Grand Juries that conditions at the jail have, in the past, been intolerable and have made inmates physically and mentally sick. I agree with the conclusion that defendants, at relevant times in the past, have been deliberately indifferent to the health of prisoners in perpetuating these conditions.

### D. *Disciplinary Due Process*

Plaintiffs also complain that the discipline meted out in the jail has been arbitrary, that prisoners have not received due process, and that there has been no effective right of appeal. Prior to the bringing of this suit, prisoners were placed in segregation or isolation for various periods of time for disciplinary reasons without any sort of procedural safeguards. They did not receive notice of the charges against them, an opportunity to have a meaningful hearing of their side of the story, or a written decision of the facts relied upon by a decision maker and the reasons for a specific punishment. As noted before, inmates have been placed in segregation for insisting on their prescriptions. Actions have had the appearance of arbitrariness, and there have been no records kept of what transpired for subsequent review.

The current Policies and Procedure Manual of the jail provides that prisoners can lose "good time," their privileges, and be placed in isolation for up to thirty days, for rules violations. The defendants insist that they "never" take away good time, and therefore due process requirements which might be imposed for such a penalty are inapposite. The defendants maintained, at a previous hearing, that there were no isolation cells in the jail. It appeared at the time of trial that defendants were dealing in semantics since they do have segregation, or isolation, as a punishment and have used it in the past. The defendants have also described some of the penalties imposed as "administrative" rather than disciplinary. I find that inmates have been disciplined without due process, and arbitrarily, in the past. Currently, defendants appear to be complying with the requirements of the law in this regard.

### E. *Access to the Courts*

Plaintiffs allege that they are denied access to the courts because they are denied access to law books. Although there is a law library in the same building, inmates are rarely allowed to utilize it. There are no law books within the jail itself. The system requires prisoners to send "kites" to guards asking for specific law books. If an inmate knows the text needed, he can request and receive it. However, if an inmate does not know specifically what books are needed, the system is virtually unavailable to him. Inmates' requests to use the library are usually rejected, although Sheriff Carey has testified that he was willing to have inmates visit the library "if they had a good reason to go." The problem is that there is inadequate staff to provide sufficient deputies to watch the inmates in the library and in the jail.

The local public defender is available but provides only criminal defense services. His contract does not provide for general legal assistance and the public defender has required fees to perform civil tasks. In one instance an inmate was unable to respond to a divorce filed by his wife because he could not afford to retain the public defender, and he was unable to consult the law library. The documents he submitted were rejected by the court as inadequate. No program exists to provide minimal legal assistance to inmates.

In another instance an inmate desiring to bring a civil rights suit was told by the public defender that the only assistance he could offer was the telephone number of the ACLU in Portland.

The plaintiffs have sustained their burden of proof that the denial of access to the law library results in denial of access to the courts.

### F. Censorship and Regulation of Mail

The inmates also complain of the arbitrary censorship of mail, or the reading of their mail by guards without apparent justification. The current Policies and Procedures Manual provides only for inspection, as opposed to reading, of the mail. This stated policy is adequate to prevent contraband from entering or leaving the facility. No adequate justification was offered for the *reading* of incoming and outgoing mail and defendants do not depend upon particularized or articulable suspicion. Evidence indicates that this is simply the practice followed without any specific justification. *See* deposition of Sheriff Carey at pp. 135–143. The reading of personal messages to and from inmates chills the exercise of this form of communication, and is without demonstrated justification.

### G. Conclusion

The above conditions existed prior to the filing of this lawsuit. I find the defendants' security inadequate, medical care indifferent to medical needs, living conditions that fail to pass constitutional muster, the failure to provide procedural due process, and censorship of mail.

I will now summarize the law which applies to these facts and findings and then discuss my conclusions.

### III. The Applicable Law

### A. The Rights of Pre-trial Detainees

The largest percentage of the inmates at the Umatilla County Jail are pre-trial detainees who are incarcerated awaiting trial and, hence, presumed innocent of any crime. Several of the witnesses were awaiting trial for relatively minor offenses (suspended drivers' licenses or inadequate motor vehicle insurance) and several had waited months for their trial. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment prohibited the "punishment" of persons unless they have been convicted of a crime. *Id.* at 535–537 and n. 16, 99 S.Ct. at 1871–73 and n. 16. While a restriction or condition of confinement may be imposed in order to insure a detainee's presence at trial or serve a security objective, courts must be ready to protect detained persons from conditions which in fact serve no valid purpose but to inflict misery on them and thereby punish them. *Id.* at 538–539, 99 S.Ct. at 1873–74.

> Thus, if a particular condition or restriction of pre-trial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." *Conversely, if a restriction or condition is not related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted* upon detainees *qua* detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a facility.

*Id.* (Footnotes and citations omitted, emphasis added).

▮ Thus, defendants may not subject pre-trial detainees to arbitrary or purposeless suffering, which is unrelated to legitimate governmental objectives. Such suffering is the "punishment" which may not be inflicted unless persons have been convicted of a crime. Of course, the protection of pre-trial detainees from "punishment" under the Due Process Clause of the Fourteenth Amendment also protects them from the "cruel and unusual punishments" proscribed by the Eighth Amendment and Fourteenth Amendment. *Bell v. Wolfish, supra,* at 545, 99 S.Ct. at 1877; *Campbell v. Cauthron,* 623 F.2d 503, 505 (8th Cir.1980); *see also Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 397 (2nd Cir.1975); Note, *Constitutional*

*Limitations on the Conditions of Pretrial Detainees,* 79 Yale L.J. 941 (1970).

### B. *The Rights of Convicted Prisoners*

The Eighth Amendment, made applicable to the States by the Fourteenth Amendment, proscribes the infliction of "cruel and unusual" punishments. These include not only barbarous tortures which are inflicted upon persons in other nations who lack our constitutional protections, as the Eighth Amendment also proscribes

> ... punishments which, although not physically barbarous; "involve the unnecessary and wanton infliction of pain," or are grossly disproportionate to the severity of the crime. Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification."

> No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." The Court has held, however, that "Eighth Amendment judgments should neither be nor appear to be merely the subjective views" of judges. To be sure, "the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the acceptability" of a given punishment. But such "judgment[s] should be informed by objective factors to the maximum extent possible." For example, when the question was whether capital punishment for certain crimes violated contemporary values, the Court looked for "objective indicia" derived from history, the action of state legislatures, and the sentencing by juries. Our conclusion in *Estelle v. Gamble* [429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 521 (1976)] that deliberate indifference to an inmate's medical needs is cruel and unusual punishment rested on the fact, recognized by the common law and by state legislatures, that "[a]n inmate must rely on prison authorities to treat his needs; if the authorities fail to do so, his needs will not be met."

> These principles apply when the conditions of confinement compose the punishment at issue. Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment. In *Estelle v. Gamble,* we held that the denial of medical care is cruel and unusual punishment because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose. In *Hutto v. Finney* [437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)] the conditions of confinement ... constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs. Conditions, other than those in *Gamble* and *Hutto,* alone or in combination, may deprive inmates of the minimal civilized measures of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency we recognized in *Gamble.* But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Rhodes v. Chapman,* 452 U.S. 337, 346–347, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1981) (Citations omitted).

I adopt this careful and restrained analysis to the issues of this case. I also look to the guidance of *Hoptowit v. Ray,* 682 F.2d 1237 (9th Cir.1982), *Wright v. Rushen,* 642 F.2d 1129 (9th Cir.1981) and *Spain v. Procunier,* 600 F.2d 189 (9th Cir.1979), and apply the analytical framework provided in *Hoptowit, supra:*

> In analyzing claims of Eighth Amendment violations, the courts must look at discrete areas of human needs. As we have recently held, "[A]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with *adequate food, clothing, shelter,*

*sanitation, medical care, and personal safety."*

In assessing claims of Eighth Amendment violations, and equally importantly, in tailoring a proper remedy, we must analyze each claimed violation in light of these requirements. *Courts may not find Eighth Amendment violations based on the 'totality of conditions' at a prison.* There is no Eighth Amendment violation if each of these basic needs is separately met. If a challenged condition does not deprive inmates of one of the basic Eighth Amendment requirements, it is immune from Eighth Amendment attack. A number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation.

*As we have said, however, "[E]ach condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related factors."*

*Hoptowit, supra,* at 1246–1247 (Citations omitted, emphasis added).

The appropriate approach in this case is to first examine specific conditions separately and then complete the analysis by analyzing the manner in which any violative condition interrelates to exacerbate other such conditions.

This approach is in accord with Supreme Court precedent:

Read in its entirety, the District Court's opinion makes it abundantly clear that the length of isolation sentences was not considered in a vacuum. . . .

The court took note of the inmates' diet, the continued overcrowding, the rampant violence, the vandalized cells, and the "lack of professionalism and good judgment on the part of maximum security personnel." The length of time each inmate spent in isolation was simply one consideration among many. We find no error in the court's conclusion that, *taken as a whole,* conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment. *Hutto v. Finney, supra,* 437 U.S. at 685–687, 98 S.Ct. at 2570–71 (Citations omitted; emphasis added). I therefore do not apply the simplistic "totality of conditions" analysis decried by *Wright v. Rushen, supra,*[3] but conduct a sequential analysis of specific conditions and then analyze their interrelationships as *Hoptowit* requires. In this task I am guided by the statement of the Ninth Circuit that, "Underlying the eighth amendment is a fundamental premise that prisoners are not to be treated as less than human beings." *Spain v. Procunier, supra* at 200.

IV. *Legal Conclusions on the Specific Claims of Inmates*

A. *The Absence of Effective Means for Protecting Inmates' Personal Safety, or Rescuing Them from Attack or Other Emergency, Violates the Prohibition Against Cruel and Unusual Punishments*

 It has long been clear that the prohibition of cruel and unusual punishments imposes upon correctional personnel a duty to rescue inmates from attack, and to take reasonable steps to prevent violent assaults on inmates. This is so because

---

**3.** *See Wright v. Rushen, supra,* at 1132: "We hold that the district court erred in its use of the 'totality of conditions' approach." It may be that this language, which appears to be a dictum, no longer accurately reflects the law of the Ninth Circuit as enunciated in the carefully considered analysis of *Hoptowit.* The language of *Hutto v. Finney* quoted above also appears to make the *Wright* dictum questionable. Perhaps the courts are merely making a purely semantic distinction, since it appears that the *Wright* court itself went on to apply a modified version of the "totality of conditions" test, *see Wright* at 1133: (Violations do not exist in isolation; court must consider exacerbations of violative conditions by other conditions) and thus *Wright* and *Hoptowit* are in accord. It appears that courts which are inclined to reverse on the merits accuse the lower court of having erred in conducting a "totality of conditions" test, while courts which are inclined to affirm do so on the basis of violations "taken as whole." *Cf. Wright, supra,* and *Hutto, supra.*

exposing inmates to a condition of indiscriminate violence, in which they are likely to be raped or beaten, constitutes cruel and unusual punishment. As the Ninth Circuit stated in *Hoptowit, supra:*

> The district court concluded that the level of violence at the penitentiary indicated that the State had failed in its constitutional duty to protect prisoners from harm
>
> . . . .
>
> *Prison officials have a duty to take reasonable steps to protect inmates from physical abuse.* The level of violence at the penitentiary supports the district judge's finding that the State has been deliberately indifferent to the safety needs of inmates . . . *Therefore, we affirm the district judge's conclusion that the level of violence at the penitentiary constitutes cruel and unusual punishment.*

*Hoptowit* at 1250 (Emphasis added; citation omitted). This principle is also in accord with *Wright v. Rushen, supra,* at 1134 n. 3 (Lack of segregation or classification of dangerous inmates, leading to victimization, beatings and rapes of less violent inmates, could constitute constitutional violation *per se,* without reference to other conditions of confinement). It is also in accord with all the other relevant precedents. *See, e.g., Hutto v. Finney, supra,* 437 U.S. at 681 n. 3, 682 n. 4 and n. 5, 687, 98 S.Ct. at 2569 n. 3, 2569 n. 4 and n. 5, 2571 ("Rampant violence" a violation of Eighth Amendment); *Ramos v. Lamm,* 639 F.2d 559, 572–573 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (Architectural features of prison, which prevented observation of interiors of cells, and inadequate guard staff led to unacceptable level of violence and resulted in Eighth Amendment violation). (*Ramos* is cited with approval in *Hoptowit, supra,* at 1250); *Woodhous v. Commonwealth of Virginia,* 487

F.2d 889, 890 (4th Cir.1973) (Inmate must be protected from sexual assault and reprisals for coming to the aid of an attack victim). Many other precedents are to the same effect, and only a brief sampling will be given here: *Holt v. Sarver,* 442 F.2d 304, 308 (8th Cir.1971); *Gates v. Collier,* 501 F.2d 1291, 1309 (5th Cir.1974); *Little v. Walker,* 552 F.2d 193, 197 (7th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978); *Cline v. Herman,* 601 F.2d 374, 376 (8th Cir.1979).

■ Under the governing precedents in this and other Circuits, I find that the conditions in the Umatilla County Jail violate the Eighth Amendment rights of convicted persons.

■ Since the lack of security violates the rights of convicted persons, it also clearly violates the rights of persons not convicted, and constitutes the "punishment" which may not be applied to them. *See Bell v. Wolfish, supra.*[4]

### B. *The Lack of Adequate Medical Care Subjects Inmates to Needless and Remediable Pain, Constitutes Deliberate Indifference to the Health of Inmates, and Violates Their Rights*

It has been the law for many years that the inmates of a correctional facility are entitled to medical care for diseases and injuries:

> The [Eighth] Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . .," against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which involve "the unnecessary and wanton infliction of pain."

4. Defendants have not advanced any legitimate governmental interest which is served by exposing inmates to attack by fellow inmates. As a matter of law, there could be none. Such an exposure to wanton violence is arbitrary and purposeless, and indeed is a *threat,* not an aid, to institutional security. I therefore infer that it is a punitive condition of the sort which may not be imposed upon pretrial detainees, *see Bell v. Wolfish, supra,* 441 U.S. at 538–539, 99 S.Ct. at 1873–74.

These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to meet his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Estelle v. Gamble,* 429 U.S. 97, 102–106, 97 S.Ct. 285, 290–92, 50 L.Ed.2d 251 (1976) (Citations and footnotes omitted).

█ Under this standard it is clear that the health care system at the Umatilla County Jail violates the Eighth Amendment.[5] The system results in inmates' suffering needlessly without medical care, and in the arbitrary and purposeless infliction of pain without penological justification. I am required to find that this system violates the Eighth Amendment as to sentenced prisoners and imposes "punishment" upon pre-trial detainees.[6]

### C. The Conditions of Confinement Have Been Inhumane and Indecent, Have Endangered the Health of Prisoners, and Constitute a Violation of the Eighth Amendment

On this issue I am guided by the teaching of *Wright v. Rushen, supra,* and *Hoptowit, supra,* that "an institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *See Hoptowit* at 1246. In the present case there has been no challenge to the adequacy of the food. I have earlier dealt with the personal safety and medical care issues in this case. The present issue is the adequacy of "clothing, shelter, and sanitation" at the Umatilla County Jail, and whether minimum conditions have been met.

### 1. Adequate Shelter

At relevant times in the past, the jail has been unfit for human habitation. Some of

5. The health care system at the jail shares the failings which resulted in the finding of a violation in *Hoptowit, supra:* inadequate staffing, lack of medical supervision, lack of a chief medical authority, inadequate organization and administration, lack of written procedures or protocols, inadequate record keeping, inadequate inmate access to the system, preliminary medical decision making by those without medical training, vesting of authority in health care matters in guards with resulting failure to secure treatment for inmates, prescription and dispensation of drugs by guards and others not qualified to act, lack of preventive health care, sanitation and public health measures, inadequate facilities for examinations and lack of psychiatric and mental health care. *See Hoptowit, supra,* at 1252–1253.

6. Defendants advanced no legitimate governmental objective which is served by allowing prisoners to suffer in pain. I infer that this treatment is obviously the "punishment" which may not be inflicted upon persons unless they are convicted, and which would consist of "cruel and unusual" punishment if imposed upon persons after conviction, *see Bell v. Wolfish, supra,* 441 U.S. at 538–539, 99 S.Ct. at 1873–74.

the problems with the facility have been ameliorated by the actions of Sheriff Carey both before and after the filing of this suit. However, major problems remain.

■ One major problem which involves both "shelter" and "sanitation" has been the overflow of sewage into the cells. This constitutes a major threat to health and constitutes cruel and unusual punishment, proscribed by the Eighth Amendment, and punishment proscribed by the Fourteenth Amendment, to sentenced and unsentenced inmates respectively.

■ Functioning plumbing, including toilets, sinks and showers, is a basic necessity of civilized life.[7] The provision of adequate means of hygiene, and the sanitary disposal of bodily wastes so that the wastes do not contaminate the cells, are constitutionally required. *Ramos v. Lamm,* 639 F.2d 559, 569 (10th Cir.1980); *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Gates v. Collier,* 501 F.2d 1291, 1300–1302 (5th Cir.1974). This is so because the facility's obligation to provide basic minima of shelter and sanitation will otherwise not be satisfied. *Id.; Dimarzo v. Cahill,* 575 F.2d 15, 16–19 (1st Cir.1978), *cert. denied,* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978); *see also Johnson v. Levine,* 450 F.Supp. 648, 656 (D.Md.1978), *affirmed,* 588 F.2d 1378 (4th Cir.1978) (*en banc*); *Valentine v. Englehardt,* 474 F.Supp. 294, 296–297 (D.N.J.1979); *Pugh v. Locke,* 406 F.Supp. 318, 323–324 (M.D.Ala.

1976). I find that the conditions which I have described impose "cruel and unusual" punishment upon convicted persons and impose "punishment" upon pre-trial detainees.

■ Another basic minimum of "adequate shelter" is a means for heating the cells in winter, and cooling or ventilating them in summer. A failure to maintain minimum requirements for human habitation violates the Eighth Amendment. *Rozecki v. Gaughan,* 459 F.2d 6, 8 (1st Cir. 1972); *Kirby v. Blackledge,* 530 F.2d 583, 586–587 (4th Cir.1976); *Martinez v. Chavez,* 574 F.2d 1043, 1046 (10th Cir.1978); *Gates v. Collier, supra,* at 1304–1305 (5th Cir. 1974). The conditions in the jail in this respect violated the Eighth Amendment at the time of the filing of the complaint. Obviously, the lack of ventilation has also exacerbated the offensive odors within the facility at relevant times in the past.[8]

■ Another basic minimum of "adequate shelter" is the provision of adequate natural or artificial light in the cells. Prior to the removal of the paint from the windows, the cells had been literally, "as dark as a dungeon." Inmates were unable to read, even during daylight hours, and suffered eye strain when they attempted to do so.[9] These conditions violated the Eighth Amendment, which has been recognized as requiring a minimum level of illumination in jails so that normal activities of life may be conducted. *Hoptowit, supra,* at 1256; *Bono v. Saxbe,* 620 F.2d 609, 617 and n. 12

7. The plumbing problem is not a question of an occasional or intermittent situation but one of an inadequate plumbing system. I am not ignoring the fact that inmates, for whatever motive, may have deliberately stuffed and sabotaged the plumbing at the facility. On occasion they have done so. However, the earlier described conditions occurred even without such inmate intervention. Indeed, testimony revealed that on occasion, inmates were *required* by guards to use the toilets to dispose of uneaten food, which exacerbated the plumbing system's defects.

8. These problems have since been largely corrected through defendants' compliance with my interim order, and through certain actions taken by Sheriff Carey prior to that order. The conditions in the jail *at present* do not violate

constitutional minima with respect to heat and ventilation, and there is no need for a further remedy as long as present practices continue. The Court visited the jail on September 2, 1982, a day when the outside temperature at Pendleton was 94° F, at 4:00 p.m. The jail was adequately ventilated at that time through the use of fans, newly-opened windows and open doors from the sheriff's office.

9. These conditions no longer exist at the jail. After the black paint was removed from the windows, prior to the filing of this suit, the jail is better lighted and reading is now possible on bright days. However, on cloudy days and during the evening reading is either difficult or impossible, due to the lack of adequate illumination in the jail.

(7th Cir.1980); *Ramos v. Lamm,* 485 F.Supp. 122, 155 (D.Colo.1979), *affirmed in relevant part,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Jones v. Wittenberg,* 323 F.Supp. 93, 95, 99 (N.D.Ohio 1971), *aff'd sub. nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir.1972); *Dawson v. Kendrick,* 527 F.Supp. 1252, 1288 (S.D.W.Va.1981). The discussion in *Dawson* of this issue is especially helpful, and I adopt the analysis of Judge Copenhaver in that opinion in holding that the denial of adequate light in the Umatilla County Jail constituted a violation of the Eighth Amendment.

## 2. *Adequate Sanitation*

 I have already discussed the overflow of sewage in the cells as a problem within the context of adequate shelter. It is also pertinent to the issue of adequate sanitation. That situation posed a threat to the well-being of inmates through the risk of disease. I need not repeat my analysis further here.

In addition, the general level of sanitation at the jail, aside from the sewage problem, has been inadequate.[10] Grand Jury reports and the testimony of witnesses has indicated that substandard sanitation has endangered inmates' health and caused them to contract skin diseases.

Such a state of affairs violates the Eighth Amendment. *Hoptowit, supra,* at 1246, 1256; *Jones v. Wittenberg, supra,* at 99, *aff'd sub. nom. Jones v. Metzger, supra,* at 854, 855 (6th Cir.1972).

## 3. *Adequate Clothing*

 The provision of clothing and bedding at the jail has not been adequate. These conditions have been earlier described, but it should be mentioned that inmates wore clothing up to 14 days at a time without change, due to the inadequacy of the laundry facilities. This compounded the problem described relative to the lack of blankets, sheets and clean mattresses. This matter has improved greatly since the filing of the action but, at that time, inmates' rights were violated by denying them adequate clothing. Conditions similar to those which prevailed at the Umatilla County Jail have been found to constitute an Eighth Amendment violation even when applied to convicted prisoners who violate prison regulations. *Maxwell v. Mason,* 668 F.2d 361, 363–366 (8th Cir.1981). The lack of adequate clean clothing and bedding violated the Eighth Amendment as to convicted prisoners and imposed punishment upon pre-trial detainees.[11]

## 4. *Physical Exercise*

The lack of physical exercise at the jail, which endangered the inmates' physical and mental health, could be classified as denial of adequate medical care. However, I address it here as a condition of confinement in order to make clear its interrelationship with other violative conditions, *see Hoptowit, supra,* at 1247. Inmates at the Umatilla County Jail had no opportunity for physical exercise. The "dorms" and single cells lacked sufficient space even for calisthenics, since the only space available was often contaminated from overflowing toilets. Although there is a rooftop recreation area at the jail, inmates were not allowed its regular use until the filing of this suit.[12] Such a state of affairs clearly violated the rights of inmates. *Spain v. Procunier, supra,* at 199. "There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of inmates [citations]." *Id.* at 199. The Ninth

---

**10.** Since the election of Sheriff Carey there has been a tremendous improvement in this regard. This suit also brought salutary changes to the jail in this area. Today, the jail is adequately cleaned and, except for the plumbing fixtures, poses no problems in this regard.

**11.** Defendants advanced no justification for this policy. It was clearly punitive in nature.

**12.** Inmates during certain periods prior to the filing of this suit were allowed to use the rooftop area for exercise about three times per year. I find that this is the same as a total denial of exercise, since the opportunity to exercise every four months or so is not sufficient to maintain muscle tone or physical health.

Circuit so ruled in *Spain* even though the prisoner-plaintiffs in that case were convicted felons in a maximum-security institution who had also been either charged or convicted of violent acts while in prison. They were "some of the most dangerous men in the prison population," *Id.* at 192, and allowing them to exercise entailed certain security risks. Even so, the Ninth Circuit ruled that outdoor exercise could not be denied, *even as a disciplinary measure for violent offenses in prison. Id.* at 199–200. The Ninth Circuit in that case did not decide what length of denial of exercise would constitute cruel and unusual punishment, see *Id.* at 200, but it is clear from dicta in the opinion that *any* such denial would be heavily disfavored:

> On this record the district court did not find that exercise is required for every prisoner given a *temporary* assignment to [the segregation and discipline unit] for disciplinary purposes, and we do not address that question. The district court found that outdoor exercise was required for these plaintiffs who were confined to the [unit] for more than four years. We affirm the order *and agree with the district court that it will serve an important purpose if its pendency will cause the state to reexamine its exercise policy as to all persons assigned to this facility*
> . . . .
> Underlying the eighth amendment is a fundamental premise that prisoners are not to be treated as less than human beings. The amendment is phrased in general terms rather than specific ones so that while the underlying principle remains constant in its essentials, the precise standards by which we measure compliance with it do not. It follows that when confronting the question whether penal confinement in all its dimensions is consistent with the constitutional rule, *the court's judgment must be informed by current and enlightened scientific opinion as to the conditions necessary to insure good physical and mental health for prisoners.*

*Spain v. Procunier, supra,* at 200 (Citations omitted; emphasis added).

In the present case expert witnesses testified that the denial of all outdoor exercise endangered the physical and mental health of prisoners and led to physical and mental deterioration. I agree with this testimony and find that the denial of exercise violated the Eighth Amendment as to convicted prisoners and imposed a clearly "punitive" condition upon pre-trial detainees. The cases so holding are legion and are cited in *Spain v. Procunier, supra* at 199. Two additional decisions, since *Spain v. Procunier,* are *Lightfoot v. Walker,* 486 F.Supp. 504, 511 (S.D.Ill.1980), and *Jordan v. Multnomah County,* Civ. No. 80–841–RE, (D.Or. March 31, 1982), *reversed on attorney's fees,* 694 F.2d 1156 (9th Cir.1982). Denial of exercise destroys the bodies and minds of inmates, "without penological justification," *see Rhodes v. Chapman, supra.*

Nor is *Hoptowit v. Ray, supra,* to the contrary. That opinion holds that the lack of certain "vocational, recreational, and educational" programs did not constitute an Eighth Amendment violation, since there was no right to rehabilitation under the Eighth Amendment. *Id.* at 1254. *Hoptowit,* however, did not address the issue of the denial of exercise resulting in physical and mental deterioration. Clearly *Spain v. Procunier, supra,* remains the law of this Circuit on this issue. The issue in *Hoptowit* was not exercise, but various programs which might be offered to inmates to prepare them for useful roles in society upon release. *Hoptowit, supra,* at 1254. While such programs make sense and are a wise use of societal resources, they are not required by the Eighth Amendment. *Id.* at 1255. This point in *Hoptowit* may not be stretched as defendants would have it to an overruling of *Spain v. Procunier*'s holding that *outdoor exercise* is in fact required, *see Spain* at 199–200, and its denial results in an Eighth Amendment violation. *Hoptowit* and *Spain* are not in conflict as defendants seem to believe, and *Spain* remains the law of the Circuit on the issue of outdoor exercise. I conclude that the denial of outdoor exercise in this case violates the Eighth Amendment as to convicted prisoners and

imposes "punishment" upon pre-trial detainees, *see Bell v. Wolfish, supra,* 441 U.S. at 545, 99 S.Ct. at 1877.

### 5. *Overcrowding*

▌ At times the Umatilla County Jail has been severely overcrowded. While overcrowding may not be an Eighth Amendment violation *per se* its impact upon the jail may result in the denial of "adequate food, clothing, shelter, sanitation, medical care, and personal safety," *Hoptowit, supra,* at 1246, 1248–1249. *See also Campbell v. McGruder,* 580 F.2d 521, 536–540 (D.C.Cir.1978) (Overcrowding a *per se* violation on facts of that case); *Lareau v. Manson,* 651 F.2d 96, 102–103 (2nd Cir.1981) (Excellent analysis of Supreme Court precedent; conclusion that overcrowding is "punishment" which may not be imposed upon pre-trial detainee; *Lareau* is cited with approval in *Hoptowit, supra,* at 1248).

▌ Overcrowding at the jail, which has occurred in the past at summer's end has resulted in situations in which prisoners have been denied adequate shelter, clothing, sanitation, medical care, and personal safety. An insufficient number of beds required detainees to sleep on the floor, where they have been subject to the overflow of filthy water in the cells. Overcrowding has overtaxed the laundry so that adequate clothing has not been available. Overcrowding has resulted in an increase in violence in the cells as inmates quarrelled over scarce resources and suffered from the increased tension which overcrowding causes.[13] Overcrowding has also made any classification of prisoners impossible, thus putting the weak in cells with violent and aggressive inmates and has deprived inmates of adequate personal safety. Overcrowding has also deprived inmates of adequate medical care, because it has resulted in an increased spread of infectious diseases which the medical system was unable to handle. Overcrowding at the jail has resulted in Eighth Amendment violations and the imposition of clearly punitive conditions upon pretrial detainees, *see, Hoptowit, supra,* at 1249; *Lareau, supra* at 103.

### D. *Inmates Have Been Denied Minimum Due Process in the Jail's Disciplinary Proceedings*

▌ An inmate who is subject to disciplinary action such as solitary imprisonment, disciplinary segregation, or loss of good time credits must receive minimum due process before such discipline may be imposed. *Wolff v. McDonnell,* 418 U.S. 539, 565–566, 572, 94 S.Ct. 2963, 2979, 2982, 41 L.Ed.2d 935 (1974); *Clutchette v. Procunier,* 497 F.2d 809, 820 (1974); *Bartholomew v. Reed,* 477 F.Supp. 223, 232 (D.Or.1979), *aff'd in relevant part sub. nom. Bartholomew v. Watson,* 665 F.2d 915, 917 (9th Cir.1982); *Wright v. Enomoto,* 462 F.Supp. 397, 403 (N.D.Cal.1976) (Three judge court), *aff'd mem.,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). As defined by the governing precedents outlined above, due process in this context requires *at least* advance written notice of charges, statement of the conduct which resulted in the charge, a right to a prompt hearing by a neutral decision maker, the right to call witnesses

---

**13.** The cells and dorms provide between 17 and 27 square feet of open space per inmate. This is an area roughly the size of a single bed. Inmates are forced to exist in this environment roughly 23 hours a day, as there are no day rooms. At times overcrowding has reduced the area per inmate to 10 square feet. Such conditions violate the constitutional minima. Expert witnesses testified that after two weeks of such confinement, physical and mental illness would result. I find that the square footage per inmate must be increased to approximately 70 square feet per inmate to avoid denial of "a mere minimum standard of life's necessities," *see Hoptowit, supra,* at 1249, since inmates are confined in this space virtually all day. This figure is below the standards promulgated by the American Correctional Association (ACA), and represents an irreducible minimum. Alternatively, of course, the defendants may reduce the hours per day spent in the cells, or adopt other measures to remedy the problems caused by overcrowding, *see Hoptowit, supra,* at 1249. However, the increase in violence and the collapse of living conditions in the cells is out of proportion to the increase in population, *see Id.; cf. Capps v. Atiyeh,* 559 F.Supp. 894 (D.Or. 1982), where this showing was not made. Any remedy must address this problem.

and generally participate in the hearing, the right to receive a written decision of the findings of the decision maker and the reasons for the imposition of any punishment, and the right to representation at the hearing by counsel or a substitute for counsel. *Wright v. Enomoto, supra,* at 403–405; *Bartholomew v. Watson, supra,* at 917 and n. 2; *Clutchette v. Procunier, supra,* at 818–820.

██ The defendants in the present case do not contend that prisoners subject to discipline have in fact received those rights. Rather, defendants contend that due process is not required because inmates are "never" punished in such a way as to require such safeguards. However, the jail's Policies and Procedures Manual provides for such punishments as loss of good time and up to thirty days' confinement in isolation or segregation for rules infractions. Although it does appear that in the past no inmate has ever lost good time, the rules allow it as a potential punishment. Moreover, defendants have in fact in the past punished prisoners by putting them alone in cells in which they were confined for about 23 hours a day, whether this is called "isolation" or "segregation" or "solitary." Since both potentially and in practice inmates have been subject to such punishments, it is clear that due process minima apply [14] and defendants have not afforded the required due process in discipline proceedings.

E. *Inmates Have Been Denied Access to the Courts*

██ Inmates of a correctional facility have a fundamental right of access to the courts, which requires that defendants in this suit take steps to allow or assist prisoners to research legal topics, file suits and respond to suits filed against them:

We hold therefore, that the fundamental right of access to the courts requires

prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). This right of access requires that prison officials "provide indigent inmates with access to a reasonably adequate law library for preparation of legal actions." *Wolff v. McDonnell, supra,* 418 U.S. at 578–579, 94 S.Ct. at 2985–86.

██ This fundamental right of access simply is not satisfied by the jail's current system for "paging" law books. It is completely unrealistic to expect lay persons to know the names of the law books they will need for research on a legal problem, so that these can be requested from a guard. Such a "paging" system has been found by the Fourth Circuit to constitute insufficient access, *unless* the jail or prison also gives inmates assistance from legal professionals. *Williams v. Leeke,* 584 F.2d 1336, 1338–1339 (4th Cir.1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979):

Williams is confined in the South Carolina Maximum Detention Retraining Center, a facility housing prisoners presenting the greatest security risks in the prison system. Prisoners confined in maximum security are not allowed access to a legal library. Rather, they are taken to a library cell where guards fetch law books requested by the prisoner . . . .

Ordinarily, a prisoner should have direct access to a law library if the state chooses to provide a prison law library as its way of satisfying the mandate in *Bounds.* Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might

---

**14.** Defendants argue that the solitary lockdown given as a punishment is not so very different from what is essentially a state of lockdown existing at all times in the other parts of the jail. This argument is without merit. Prisoners subject to disciplinary segregation are confined alone in very small cells all day, except for a brief period for showers. They do not take their meals in the mess hall as do other prisoners, but eat in their cells. While the conditions in the rest of the jail also violate inmates' rights, the conditions in the "segregation units" are clearly worse, and constitute avowedly punitive restrictions on prisoners' conditions of confinement.

have. Legal research often requires browsing through various materials in search of inspiration ... Certainly a prisoner, unversed in the law and the methods of legal research, will need more time and more assistance than the trained lawyer in exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

Although in *Williams* the defendants also provided state funded legal assistance to prisoners, *Id.* at 1339, which remedied the inadequate prison library access, the defendants in the present case do not provide such assistance and there is no other program which would give assistance to prisoners in the jail. Inmates have only the "paging" system which does not provide meaningful access. It is therefore clear that inmates are denied the required access to the courts. *See Williams v. Leeke, supra,* at 1339; *see also Rich v. Zitnay,* 644 F.2d 41, 43 (1st Cir.1981) ("Ultimate burden" of proving that provisions for legal research or legal assistance are adequate is on defendants); *Ramos v. Lamm, supra,* 639 F.2d at 583–585 (Burden of proving adequate access is on defendants); *Cruz v. Hauck,* 627 F.2d 710, 720–721 (5th Cir.1980) (District court erred in conclusion that a prison library without any librarian, staff or paralegal assistance was adequate to provide meaningful access); *Leeds v. Watson,* 630 F.2d 674, 675–676 (9th Cir.1980) (District court erred in finding adequate access to courts where there was no free access to law library and legal assistance was inadequate).[15]

### F. *Unjustified Censorship and Regulation of Mail*

The plaintiffs also challenge the jail's practice of reading inmates' outgoing mail. Although the jail's Policies and Procedures Manual allows only the *inspection* of mail for contraband, and not the reading of mail,

apparently the inmates' outgoing mail is read.

The First Amendment governs such restrictions upon inmates' mail privileges. *Procunier v. Martinez,* 416 U.S. 396, 409, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974). The Supreme Court in *Procunier v. Martinez* held that a regulation on the right of *convicted prisoners* to correspond by letter must satisfy a two-part test. First, correctional officials must show that such a regulation "furthers one or more of the substantial governmental interests in security, order and rehabilitation." *Id.* at 413, 94 S.Ct. at 1811. "Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* This test has been restated by the Ninth Circuit in *Pepperling v. Crist,* 678 F.2d 787, 789–90 (9th Cir.1982) (Prison officials could not prevent prisoners' receipt of "sexually explicit" and drug-oriented periodicals). I apply the *Procunier-Pepperling* test to the First Amendment claims of convicted prisoners in the jail.

As to pre-trial detainees, a different analysis is required. The Ninth Circuit has held that the *Procunier-Pepperling* test, developed for convicted prisoners, is inapplicable to the rights of pre-trial detainees, who are "presumed to be innocent of crime" and whose detention is based solely upon inability to make bail. *Inmates of San Diego County Jail v. Duffy,* 528 F.2d 954, 956 (9th Cir.1975). However, the Ninth Circuit in *Duffy* did not feel called upon to define the appropriate standard. I have examined other cases on this issue which the Ninth Circuit in *Duffy* cited with approval, such as *Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D.Cal.1975); *Rhem v. Malcolm,* 507 F.2d 333 (2nd Cir.1974); and *Payne v. Whitmore,* 325 F.Supp. 1191 (N.D.Cal.1971). Synthesizing the guidance of these cases, I find that the appropriate test for restrictions upon

---

15. No party has urged that a different standard applies in this respect to the claims of pretrial detainees vs. convicted prisoners. The rights of both groups derive from the same textual basis, the Due Process Clause of the Four-

teenth Amendment. It is however arguable that a more stringent standard should apply to protect the rights of pretrial detainees, but I am not required to reach this issue and apply the same standard to both subclasses in this case.

the First Amendment rights of pre-trial detainees is a test which is more sensitive to First Amendment rights than even the highly-protective *Procunier-Pepperling* standard. I apply the standard enunciated by Judge Zirpoli in *Brenneman v. Madigan,* 343 F.Supp. 128, 141–142 (N.D.Cal.1972). Under this standard, pre-trial detainees are not subject to any regulation which is not "absolutely necessary to ensure their presence at trial." *Id.* at 142. Correctional officials seeking to achieve this goal must use "the least restrictive" method of doing so. *Id.* Under this standard, "it is difficult to justify any restrictions at all on the amount or content of a pre-trial detainee's outgoing correspondence." *Id.* at 142.

 Applying the *Procunier-Pepperling* standard to the rights of convicted inmates of the jail, and the *Brenneman* standard to the rights of pre-trial detainees, I find that both standards prohibit the reading of inmates' outgoing mail. Such mail may be inspected to prevent the shipment of contraband, but may not be read. No legitimate governmental purpose has been advanced for the reading of this mail.[16]

I therefore find that defendants' practices have violated the First Amendment rights of the plaintiffs.

### V. *Summary and Conclusion; The Interaction of Violations*

 In this opinion I have identified the individual violations of the plaintiffs' rights to adequate clothing, shelter, sanitation, medical care, personal safety, disciplinary due process, access to courts and personal communication. I have also identified the interactions of certain of these violations with other violations, which has produced even more serious violations. For instance, the lack of adequate personal safety at the jail interacts with the inadequate medical care at the jail, since prisoners who ·are injured in fights have trouble getting medical treatment. The lack of adequate sanitation interacts with the lack of medical care in that defects of sanitation increase the risks of disease which the medical care system cannot handle. Defects in disciplinary due process have exacerbated the inadequacy of medical care at the jail, as for instance, in the case of the inmate who complained about the nurse's changing of his prescription and was put in solitary for doing so. The inadequacy of the shelter at the jail, and especially the heating problems, have been exacerbated by the inadequate clothing and bedding given to prisoners. I emphasize that *each* of these conditions constitutes an individual violation, which is then exacerbated by the other violations I have found.

Consideration of the *interaction* of these conditions, however, reinforces my conclusion that plaintiffs' rights have been violated. *See Hoptowit, supra,* at 1247; *Hutto v. Finney, supra,* 437 U.S. at 687, 98 S.Ct. at 2571. In this context I have also considered the length of time which prisoners spend in the jail. While a number of prisoners may spend only a few days at the jail, or less, there are hundreds of prisoners each year, both persons convicted of minor offenses and those awaiting trial, who serve more than a month in the facility. Expert testimony as to the conditions of confinement in the jail identified two weeks as the approximate limit of time a human being could exist in the facility before the conditions of confinement would lead to mental or physical disease. I concur with this conclusion, but I note that many of the violations I have found, such as those arising from inad-

---

**16.** There could be no security justification because inmates' phone calls and visits are admittedly not monitored. If an inmate wished to plan an escape, she or he would do so over the phone or in person. Likewise if an inmate wished to make a threat against a person on the "outside," the phone would be used. It appears that inmates' mail is read simply because some defendants are curious as to what inmates say to their correspondents. Such cu-

riosity is not a legitimate governmental justification which outweighs the privacy interests of pretrial detainees or convicted prisoners. However, nothing in this opinion shall be interpreted as limiting the defendants' ability to monitor mail where an actual, articulable suspicion is present as to a specific inmate's risk to the security of the institution. In such a case the inmate's mail could be read by defendants, in the presence of the inmate.

equate personal safety and inadequate medical care, could result in serious bodily harm to an inmate who had been jailed only the day before. Each year, moreover, there are between twenty and thirty inmates who may spend more than *four* months in the jail, either awaiting trial or serving time. For these inmates, obviously, the impact of violative conditions is greatest.

### VI. *The Remedy*

Plaintiffs shall be entitled to judgment. Defendants shall propose, within thirty days of the date of this opinion, a plan for alleviating those violations which still exist at the jail. I suggest that the security and medical care problems carry the highest priority. Defendants shall also advise the court on the progress of the current renovations of the facility and the impact this may have in alleviating violative conditions. If there is no response from defendants within thirty days, the court will fashion its own remedy based upon the suggestions of plaintiffs.[17]

**17.** I allow the defendants to propose a compliance plan, rather than formulating the remedy myself, in light of the statement in *Hoptowit, supra,* at 1247 that "the court should defer to the policy choices made by prison officials and order a remedy consistent with the basic approach taken by prison officials, unless that approach itself is inconsistent with the Eighth Amendment." I am aware that Judge Tang dissented from this portion of the *Hoptowit* decision, *see Id.* at 1263, 1266, and that many have found his dissent persuasive. I am aware that this aspect of the *Hoptowit* decision remains controversial, even within this Circuit, and that the *en banc* procedures in that case required six months to reach their conclusion. A more fundamental question is whether *Hoptowit* even applies to the claims of the pretrial detainees in this case, who do not assert rights to a remedy under the Eighth Amendment but under the Fourteenth Amendment. The federal court's remedial power may well be much broader under the Fourteenth than under the Eighth Amendment as applied through the Fourteenth. Certainly a court should be cognizant of the different standards which apply to the two types of cases, and a court is required to stop "punishment" of pretrial detainees *to any extent,* whereas the question as to convicted prisoners is whether a given quantum of misery exceeds constitutional requirements. As to the claims of pretrial detainees in this case, I allow the defendants to propose a remedy simply as a matter of the exercise of the inherent equitable powers of a federal court, and this should not be construed as a holding that *Hoptowit's* limitations upon remedies necessarily apply to the claims of pretrial detainees, an issue which the Ninth Circuit has not yet addressed.