**Clifford GUERRERO, Plaintiff,**

v.

**Louis CAIN, Defendant.**

**Civ. No. 83–52–RE.**

United States District Court,
D. Oregon.

Nov. 21, 1983.

Clifford Guerrero, pro se.

Jack D. Hoffman, Morrison, Dunn, Carney, Allen & Tongue, Portland, Or., for defendant.

OPINION

REDDEN, District Judge:

Plaintiff Clifford Guerrero brings this action under 42 U.S.C. § 1983, asserting a violation of his constitutional rights. Trial

was held at the Oregon State Penitentiary on October 4, 1983 and, pursuant to the agreement of the parties, additional testimony was taken by telephone October 11, 1983. No jury was requested.

*Background*

Plaintiff was shot while attempting to rob a bookstore in southeast Portland on November 25, 1982. He was arrested and taken to Portland Adventist Medical Center for treatment of his injuries, the most serious of which was a wound to his left leg.

On November 27, 1982, plaintiff was transferred to Rocky Butte Jail. He was admitted to the hospital ward of the jail and a leg iron was placed around his right ankle, connected to his bed by a metal chain. Plaintiff remained chained to his bed until December 1, 1982, except when he was released to shower and when he left the facility for a court appearance.

Plaintiff contends that chaining him to his bed violated his constitutional rights. He seeks $25,000 in damages from defendant Louis Cain, who was acting jail commander when plaintiff was admitted to Rocky Butte and who ordered that plaintiff be chained. Plaintiff also requests that defendant be suspended from his job for one year.

*Discussion*

■ Plaintiff's pro se complaint is to be liberally construed. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Plaintiff's allegations are sufficient to state a cause of action for violation of his right to due process, as well as his rights to equal protection and to be free from cruel and unusual punishment.

■ Because plaintiff had not yet been convicted at the time of the chaining, his claim should be considered under the Due Process Clause rather than the Eighth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The basic inquiry is whether the treatment of a pretrial detainee amounts to "punishment." *Id.* at 535 and n. 16, 99 S.Ct. at 1872 and n. 16. The government may detain a person

in order to ensure his presence at trial and may subject him to certain restrictions so long as they fall short of punishment and do not otherwise violate the Constitution. *Id.* at 537–538, 99 S.Ct. at 1873.

The test used in *Bell v. Wolfish* provides that

> ... if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.

*Id.* at 540, 99 S.Ct. at 1874.

 Courts should use restraint in assessing the constitutionality of conditions of confinement. *See Martino v. Carey,* 563 F.Supp. 984, 995 (D.Or.1983). The Ninth Circuit has emphasized that courts should consider "legitimate security concerns," although they should not "unquestioningly defer" to them. *Wright v. Rushen,* 642 F.2d 1129, 1134 (9th Cir.1981). Security concerns must be assessed in keeping with the principle that in the absence of an expressed intent to punish, the constitutionality of a restriction on a pretrial detainee "generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.'" *Bell v. Wolfish, supra,* 441 U.S. at 539, 99 S.Ct. at 1874.

Although plaintiff alleged that one reason he was chained was because of his race, he presented no evidence to sustain the contention. Plaintiff's theory is that he was treated this way because defendant associated him with certain other prisoners whom jail officials considered dangerous. He claims that defendant overreacted and also that defendant acted vindictively, seeking to punish anyone connected with these other prisoners, who were known as the "Kessler gang." Defendant does not deny having made the connection between plaintiff and the Kessler gang. On the contrary, defendant asserts that he acted reasonably in doing so and in chaining plaintiff in part because of that perceived connection.

According to defendant and his superior at Rocky Butte, Lieutenant Warren Cook, the Kessler gang included a group of six inmates who in August of 1982 had taken several hostages and escaped from Rocky Butte, seriously wounding a corrections officer in the process. When plaintiff was brought to Rocky Butte, a number of the escapees had been recaptured and returned to the jail. Inez Guerrero, plaintiff's uncle, was in Rocky Butte and was one of those considered to be a member of the Kessler gang. He had not been involved in the escape, but as an associate of the Kessler gang, was thought to be involved in ongoing attempts to escape.

Plaintiff testified that on his way to Rocky Butte from Portland Adventist Medical Center a police officer learned that he was related to Inez Guerrero and told plaintiff that his uncle was in Rocky Butte. Plaintiff had not seen his uncle for twelve years. When he arrived at the jail he immediately asked defendant to place him with Inez Guerrero, telling defendant that he had a lot to discuss with his uncle.

Plaintiff insists his wishes were innocent and understandable, and they apparently were. However, to defendant they were cause for alarm. He and other witnesses testified that in late November 1982 rumors were rampant that members of the Kessler gang who were still at large were going to try to break the others out of Rocky Butte. Additional security measures had been taken as a result. In addition, jail personnel were in a general state of agitation due to the earlier escape. A task force formed in the aftermath of the escape had criticized jail security standards and security had been tightened in various

ways in the period between the escape and plaintiff's admission to the jail hospital ward.

This background cannot excuse unconstitutional actions by jail officials, but it does explain defendant's reaction to plaintiff's request to be with his uncle. Defendant testified that he knew of the Kessler gang's connection with plaintiff's uncle and feared that plaintiff had an escape plan he wanted to discuss with his uncle. Defendant had also checked plaintiff's police record and his reputation with other jail personnel. He knew that plaintiff had been involved in an armed robbery and that plaintiff had been incarcerated in the past. He considered plaintiff "jail-wise" and thus more of an escape risk.

Defendant ordered that plaintiff be chained to his bed. At trial, a chain was entered into evidence and defendant testified that although it was not the chain plaintiff had to wear, it was "very similar" to it. The chain was light-weight and about twenty feet long. Plaintiff testified that the actual chain was only about twelve feet long. It did not reach far enough to enable him to take a shower; he had to wait for a guard to release him first. He was able to walk around the room and to use the bathroom, however. Plaintiff testified that although the leg iron scraped against him at first, a nurse wrapped his leg in gauze and kept an eye on him to make sure that his leg stayed protected. The leg iron did not interfere with plaintiff's wounds.

Plaintiff argues that another inmate on the ward was not chained even though he had shot a policeman. Members of the jail hospital staff testified that the other man was 81 years old and very feeble. He had leg sores which would have been aggravated by chaining him. Defendant testified that he had decided to chain the other man, but that hospital staff objected because chaining would interfere with the man's treatment. Defendant deferred to their judgment.

Plaintiff argues that his wounds made it impossible for him to escape. He testified that because of the gunshot wound in his leg he was unable to stand or walk without using crutches or holding onto the bed. Richard Turnbow, supervisor of nurses at the jail, acknowledged that plaintiff had a "fairly deep" wound to the leg. Neither Turnbow nor nurse Margaret Scott testified to seeing plaintiff walk other than on crutches, but they did not feel it would have been impossible for plaintiff to escape from the hospital ward.

█ Plaintiff claimed severe mental suffering because of the chain. Jail medical records show that he did complain about the chain. Following transfer his wound became infected but he refused to return to the ward because he did not want to be chained. Chaining is an extreme measure, justifiable only under unusual circumstances. Being chained to a fixed—or relatively fixed—object is particularly agonizing and requires a thorough review of the circumstances under which it was authorized. *Compare Tate v. Kassulke*, 409 F.Supp. 651 (W.D.Ken.1976) (the Eighth Amendment was not violated because the plaintiff was not chained to his bed for a "protracted length of time"); *Gates v. Collier*, 349 F.Supp. 881 (N.D.Mississippi 1972), *aff'd*, 501 F.2d 1291 (5th Cir.1973) (enjoining the handcuffing of prisoners to fences, bars or "other fixtures"); *Landman v. Royster*, 333 F.Supp. 621, 647 (E.D. Va.1971) (chaining and handcuffing inmates in cells violated the Constitution where they were unable to eat or relieve themselves and the treatment resulted in lack of sleep, prolonged physical pain and scars).

I find, however, that defendant chained plaintiff because of legitimate security concerns, and that the chaining was not excessive in relation to those concerns. The jail hospital is a minimum security area. Defendant was not aware of any prior escape attempts by plaintiff, but he had familiarized himself with plaintiff's record and reputation within the jail. In the then existing

atmosphere at the jail, defendant's increased concern due to plaintiff's request to be with his uncle is justifiable.

■ Defendant reported his action to his superior, Lieutenant Cook, and Cook ratified it. Plaintiff was the only one of the several inmates on the ward to be chained, but corrections officers and hospital staff members testified that chains have been used on other occasions.[1] The chain placed on plaintiff allowed him to eat, sleep, move around and relieve himself. It did not interfere with his wound, although it undoubtedly increased his discomfort.

■ Plaintiff was not a dangerous prisoner the equal of the inmates in *Spain v. Procunier,* 600 F.2d 189 (9th Cir.1979), who were shackled whenever moved inside the prison over a period of years. He was a pretrial detainee with a constitutional right to be detained without punishment. I find that his chaining did not constitute punishment because it was reasonably related to jail security and as administered was not excessively restrictive. Plaintiff was not chained because of his race. Defendant's action violated neither the Due Process nor the Equal Protection clause of the Constitution.

---

[1] It would be better practice to have a written policy regarding the use of chains, but the absence of such does not make defendant's action an abridgment of plaintiff's constitutional rights. At the time of the decision defendant was in command. He obtained as much information about plaintiff as was available and relied upon that information in addition to other facts known to him. He subsequently received ratification from his superior. The decision made by defendant was not objected to, on medical grounds, by the hospital staff. In short, the decision was not left to the uncontrolled discretion of a guard. *See Fulford v. King,* 692 F.2d 11 (5th Cir.1982).